*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JUDE M., | ) | |
| | ) | Supreme Court No. S-16233 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-11-00121 CN |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, | ) | |
| DEPARTMENT OF HEALTH & | ) | No. 7168 – April 28, 2017 |
| SOCIAL SERVICES, OFFICE | ) | |
| OF CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant. Laura Fox, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee. Anita L. Alves, Assistant Public Advocate and Richard Allen, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

MAASSEN, Justice.
STOWERS, Chief Justice, with whom WINFREE, Justice, joins, concurring in part and dissenting in part.

# I. INTRODUCTION

A father appeals a superior court order granting long-term guardianship of his daughter to maternal relatives in another state. The father has a history of inappropriate sexual relationships and during four years of the child's life was incarcerated following a federal conviction for transportation of child pornography. The superior court ordered the guardianship based in part on expert testimony that the father could not yet be left alone with his daughter, given the state of his progress with sex offender treatment, and in part because his probation conditions prohibited unsupervised contact with anyone under 18.

We conclude that the superior court had the statutory authority to establish a guardianship under these circumstances. But the court's finding that the daughter was likely to suffer serious emotional or physical harm if returned to her father's care was based in part on findings that lack the required basis in the expert testimony. We therefore remand for the superior court to consider whether the remaining findings are sufficient to support the guardianship order.

# II. FACTS AND PROCEEDINGS

## A. Facts

Dana was born in July 2008 to Jude and Marya M.[1] Marya has five other children, Dana's half-brothers and -sisters. Dana is an Indian child under the Indian Child Welfare Act (ICWA).[2]

---

[1]   We use pseudonyms to protect the parties' privacy.

[2]   25 U.S.C. § 1903(4) (2012).

### 1. Dana's placement history

Dana lived with both parents for her first nine months, but Jude then took her away because of his concerns about Marya's heavy drinking. Soon afterward the police began investigating Jude for possession of child pornography — explicit photographs of his teenaged half-sister. The police contacted the Office of Children's Services (OCS), which placed Dana with Jude's friends, the Carelawns. Jude visited Dana several days a week until his arrest in November 2009. Dana was then returned to her mother's custody and OCS closed its file. In December 2009 Jude pleaded guilty to the federal offense of transporting child pornography across state lines and was sentenced to 60 months in prison followed by five years of supervised release.

Dana lived with her mother and half-siblings for about a year and a half. OCS opened this case in April 2011, when Marya left the children alone in an apartment. Dana was again placed with the Carelawns until July 2013, when OCS decided she should live with Marya's sister, Natalia Winsome, in another state. Although the Carelawns wanted to adopt Dana, Natalia's family was a priority placement under ICWA.[3] The superior court upheld OCS's transfer decision in February 2014 following a contested placement hearing, and OCS moved Dana out of state in late May to live with the Winsomes.

While living with the Winsomes, Dana was sexually abused by Natalia's minor son Roland. When Dana told the Winsomes about the abuse in April 2015, they immediately took her to the hospital. Roland was arrested for sexual assault and removed from the home. At the time of the second termination trial Dana was still living with the Winsomes, and the entire family was participating in a state program for

---

[3] *See* 25 U.S.C. § 1915(b) (2012). In addition to the family relationship, Natalia and Marya are members of the same Alaska Native tribal entity.

families suffering the effects of sexual abuse. Dana had received individual treatment as well.

### 2. Jude's sexual history and treatment

Jude has a history of inappropriate sexual relationships beginning in childhood and including sex with cousins, an ex-girlfriend of his father, a half-sister, and (more or less contemporaneously) the half-sister's mother, his former stepmother. Jude spent several years of his 60-month prison sentence at Devens Federal Medical Center in Massachusetts, which provides a voluntary program for sex-offender rehabilitation. There he was diagnosed with two paraphilic disorders: "hebephilia" because of his strong sexual attraction to teenaged girls and "incest" because of his relationship history and sexual fantasies.

Jude successfully completed Devens's intensive sex-offender treatment program, and a risk assessment rated him as having a "Low-Moderate" risk of sexual recidivism. A Relapse Prevention Plan recommended that he "should have NO contact with any children under the age of 18 . . . unless supervised by a responsible adult who is aware of [his] sex offense history." The Plan advised that if Jude were allowed to live with Dana he "should not be alone with his daughter at any time nor should he enter her bedroom" or "act as a chaperone for his daughter and her friends." In December 2013 Jude was relocated from Devens to a halfway house in Anchorage, from which he was released in May 2014. He continued treatment locally with Dr. Allen Blair, who discharged him in January 2015 because he had completed his treatment goals.

### B. Proceedings

### 1. First termination trial

Dana was adjudicated a child in need of aid in December 2011. OCS petitioned to terminate Jude's parental rights in August 2012 on the grounds that Jude

would "not be released until 2014, and it is at best unclear if he will have resolved his history of sexual behavior against underage female relatives by then."[4]

After hearing testimony in April 2014, the superior court found five of the six elements required for termination: (1) Dana was a child in need of aid due to concerns about Jude's sexual history; (2) Jude's troubling conduct had not been remedied; (3) OCS had made timely and reasonable efforts to provide family support services; (4) active efforts had been made to reunify the family; and (5) termination was in Dana's best interests.[5] But the court could not find beyond a reasonable doubt one of the elements required for termination: that returning Dana to Jude's care was likely to result in serious emotional or physical damage to her.[6] Without "[an] expert witness who had performed a specific diagnostic assessment of the risk posed by [Jude]," the court had "[a] reasonable doubt about [Jude]'s capacity to change," which precluded a finding of likely harm. The court therefore denied termination.

### 2. Second termination trial

Jude and OCS could not agree on an appropriate permanency plan once Dana moved out of state to live with the Winsomes, and the superior court scheduled a second termination trial. At OCS's request the superior court agreed to consider the alternative of a long-term guardianship with the Winsomes. It heard evidence in October and November 2015.

---

[4] OCS also requested termination of Marya's rights. She failed to appear for trial, and the court terminated her parental rights in June 2014.

[5] *See* AS 47.10.088(a) – (c); 25 U.S.C. § 1912(d) (2012); CINA Rule 18(c).

[6] *See* 25 U.S.C. § 1912(f); CINA Rule 18(c)(4).

Dr. Richard Lazur, who had been retained by OCS to assess Jude, testified that Jude's risk of reoffense within a year was 3.2% and within five years was 5.9%. The superior court found that both Dr. Lazur and Dr. Blair, Jude's treating therapist, believed that Jude continued to pose "a small but significant risk" to Dana. Both experts "recommended a detailed transition program with safeguards to protect [Dana]" and that "any reintroduction should occur over a long period of time in a safe, therapeutically-controlled environment."

The court again concluded that OCS had proven all but one element required for termination; it found that the likelihood of harm from Dana's return to Jude's care was proven by clear and convincing evidence but not beyond a reasonable doubt. The court found that "[a]ccording to Dr. Lazur, [Jude] has made outstanding progress toward recovery" and "the evidence [still] fails to show beyond a reasonable doubt that [Jude]'s conduct is unlikely to change." The court therefore denied termination for a second time.

### 3.    Guardianship order

Having denied termination, the court turned to OCS's alternative request that Dana be placed in a long-term guardianship with the Winsomes. The court first determined that it was authorized to consider guardianship because Jude's parental rights had been suspended both by Dana's status as a child in need of aid and by the terms of Jude's probation, which prohibited unsupervised contact with Dana. The court made three findings required to support a guardianship order: (1) that active efforts were made and were unsuccessful; (2) that "leaving the child in the parent's custody would likely cause 'serious emotional or physical damage' "; and (3) "that appointment of a guardian would be in the child's best interest." The court appointed the Winsomes as Dana's

guardians until she turns 18, giving them discretion over future contact between Dana and Jude, "guided by the therapeutic recommendations for [Dana]."

Jude appeals from this order. The guardian ad litem sides with OCS in supporting the order.

## III. STANDARDS OF REVIEW

"In child in need of aid cases, 'we review the trial court's factual findings for clear error and its legal determinations de novo.' "[7] "We will find clear error only when a review of the entire record leaves us 'with a definite and firm conviction that the superior court has made a mistake.' "[8] "[I]t is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence."[9] Thus, "[c]onflicting evidence is generally not sufficient to overturn a trial court's factual findings, and we will not reweigh evidence when the record provides clear support for a trial court's ruling."[10]

---

[7] *Emma D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 322 P.3d 842, 849 (Alaska 2014) (quoting *Chloe O. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 309 P.3d 850, 855 (Alaska 2013)).

[8] *David S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 270 P.3d 767, 774 (Alaska 2012) (quoting *S.H. v. State, Dep't of Health & Social Servs., Div. of Family & Youth Servs.*, 42 P.3d 1119, 1122 (Alaska 2002)).

[9] *Tessa M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 182 P.3d 1110, 1114 (Alaska 2008) (quoting *In re Adoption of A.F.M.*, 15 P.3d 258, 262 (Alaska 2001)).

[10] *Emma D.*, 322 P.3d at 849 (quoting *Chloe O.*, 309 P.3d at 856).

"Whether a trial court's findings are consistent with the child in need of aid" or other applicable statutes "is a question of law that we review de novo."[11] "Statutory interpretation is also a question of law,"[12] for which we adopt "the rule of law that is most persuasive in light of precedent, reason, and policy."[13]

"Whether the state complied with the 'active efforts' requirement of [ICWA] is a mixed question of law and fact."[14] "Whether a child would likely suffer serious physical or emotional harm if returned to a parent's custody is a question of fact."[15] We review for abuse of discretion the superior court's determination that guardianship is in the child's best interests, though we review any underlying findings of fact for clear error.[16] "In appointing a guardian, the superior court 'abuses its discretion if it considers improper factors, fails to consider statutorily mandated factors, or assigns too much weight to some factors.' "[17]

---

[11]    *Tessa M.*, 182 P.3d at 1114 (citing *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004)).

[12]    *Madonna v. Tamarack Air, Ltd.*, 298 P.3d 875, 878 (Alaska 2013) (citing *Curran v. Progressive Nw. Ins. Co.*, 29 P.3d 829, 831 (Alaska 2001)).

[13]    *Tessa M.*, 182 P.3d at 1114 (quoting *Brynna B.*, 88 P.3d at 529).

[14]    *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1267 (Alaska 2008) (citing *T.F. v. State, Dep't of Health & Soc. Servs.*, 26 P.3d 1089, 1092 (Alaska 2001)).

[15]    *Chloe O.*, 309 P.3d at 856 (citing *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 270 (Alaska 2011)).

[16]    *In re M.K.*, 278 P.3d 876, 880-81 (Alaska 2012).

[17]    *Id.*, 278 P.3d at 881 (quoting *Farmer v. Farmer*, 230 P.3d 689, 693 (Alaska 2010)).

## IV.    DISCUSSION

Jude's claims on appeal focus on the long-term guardianship order and fall into three main categories:  (A) that the order exceeded the superior court's statutory authority, (B) that the court applied the wrong standard of proof for its finding of a likelihood of harm, and (C) that the evidence does not support the court's findings.

### A.    The Superior Court Was Authorized To Establish A Guardianship Under AS 13.26.045.

Alaska Statute 13.26.045 authorizes the superior court to "appoint a guardian for an unmarried minor if all parental *rights of custody* have been terminated or suspended by circumstances or prior court order."  (Emphasis added.)  Jude argues that the court lacked authority to establish a guardianship under this statute because his rights had not been terminated or suspended.  He specifically challenges the court's reliance on Dana's CINA status as having "suspended" his rights,[18] arguing that he retained "residual rights" of parenting despite OCS's physical custody of Dana.[19]  Alaska Statute 13.26.045 does not define "suspended"[20] and the parties dispute its meaning; we consider the meaning of a statutory term de novo.[21]

---

[18]    Jude does not directly challenge the superior court's reliance on his probation conditions as a separate suspension of his parental rights.  Because we agree with the superior court that Jude's custodial rights were suspended by the CINA adjudication, we need not address the effect of the probation conditions.

[19]    AS 47.10.084(c).

[20]    *See* AS 13.26.005 (definitions).

[21]    *Doe v. State*, 189 P.3d 999, 1002-03 (Alaska 2008) ("We give de novo review to questions of law, including issues of statutory interpretation." (citing *Doe v. State, Dep't of Pub. Safety*, 92 P.3d 398, 402 (Alaska 2004))).

It is true, as Jude contends, that the parent of a child in OCS custody retains "residual rights" unless and until all parental rights are terminated; these residual rights include "the right and responsibility of reasonable visitation, consent to adoption, consent to marriage, consent to military enlistment, [and] consent to major medical treatment."[22] But rights of custody are not included in those residual rights.[23] The question, therefore, is whether Jude's *custodial rights* were suspended while Dana was in OCS's custody.

"When a child is committed under AS 47.10.080(c)(1) to the department, . . . a relationship of legal custody exists" between OCS and the child, imposing on OCS the daily custodial responsibilities that would otherwise be the parent's.[24] In contrast, as the superior court explained, "[Jude] has neither the right of physical custody nor any day-to-day right of legal custody. He cannot take [Dana] to the park, make her a sandwich, or tuck her in at night." To "suspend" rights means to temporarily prevent their exercise.[25] Because Jude was prevented from exercising his "parental rights of

---

[22]     AS 47.10.084(c).

[23]     We do not address the circumstance in which the trial court returns the child to the parent's custody in an ongoing CINA proceeding. *See* AS 47.10.080(c)(2).

[24]     AS 47.10.084(a) ("[The relationship of legal custody] imposes on [OCS] the responsibility of physical care and control of the child, the determination of where and with whom the child shall live, the right and duty to protect, nurture, train, and discipline the child, [and] the duty of providing the child with food, shelter, education, and medical care. . . .").

[25]     "Suspend" means " [t]o interrupt; postpone; defer" or "[t]o temporarily keep (a person) from performing a function . . . or exercising a right or privilege." *Suspend*, BLACK'S LAW DICTIONARY (10th ed. 2014).

custody" once OCS took custody of Dana, his parental "rights of custody" were suspended as that term is used in AS 13.26.045.[26]

Jude argues that "[t]he logical extension" of this holding is that any child custody order granting "one parent sole legal and physical custody" suspends the non-custodial parent's rights. But the analogy to private child custody disputes is inapt, as demonstrated by the Arizona case on which Jude relies, *Morales v. Glenn*.[27] The parents in *Morales* had divorced, and the father was awarded sole custody of two minor children.[28] After the father died the superior court ordered the children returned to the mother, but a probate court simultaneously entertained a petition for guardianship brought by the paternal grandparents, who argued that the mother's custodial rights had been terminated by the award of sole custody to the father.[29] The Arizona Supreme Court held that the grandparents' guardianship petition should be dismissed.[30] It noted that the original custody decree "was silent as to the mother's fitness to have custody of the children," that she had been granted reasonable rights of visitation, and that she "regained all rights of custody . . . at the time of the death of the father . . . and actual custody by reason of the order of the [superior] court."[31] The court expressly rejected

---

[26]    *See A.H. v. State*, 779 P.2d 1229, 1232 (Alaska 1989) ("[T]he designation of the minors as children in need of aid acted to cut off the father's sole legal custody . . . .").

[27]    560 P.2d 1234 (Ariz. 1977).

[28]    *Id.* at 1236.

[29]    *Id.*

[30]    *Id.* at 1238.

[31]    *Id.* at 1236-37.

the idea that, absent express findings on the issue, an award of custody to one parent created a presumption that the other parent was unfit to have custody.[32]

The opposite is true in the case of a child in need of aid. OCS has custody only because of a judicial determination that the parent has committed conduct or created conditions that put the child's welfare at risk.[33]

Jude also finds support for his argument in a regulation, 7 Alaska Administrative Code (AAC) 56.370(b), which states in part that an agency may not place a child in a guardianship without having on hand, among other things, "evidence that . . . parental rights have been terminated or suspended by the court." Jude argues that every case to which subsection .370(b) applies involves a child that "has been, like Dana, adjudicated to be a child in need of aid," so the regulatory requirement is superfluous if a CINA adjudication necessarily suspends parental rights. But as OCS points out, the provision applies to cases other than CINA cases and to agencies other than OCS,[34] and it simply identifies the authorization paperwork necessary for any such agency to proceed with a guardianship. The regulation does not purport to supplement the guardianship statutes by requiring an additional finding of termination or suspension.[35]

---

[32]     *Id.* (citing *Ward v. Ward*, 353 P.2d 895, 901 (Ariz. 1960)).

[33]     *See* AS 47.10.011 (defining children in need of aid).

[34]     Under 7 AAC 56.010(a) (2015), the provisions apply to licensed "child placement agencies," including, for example, programs for runaway minors operated by municipalities or corporations. *See* AS 47.10.310.

[35]     We also reject Jude's argument that the phrase "adoption or legal guardianship" in AS 47.10.080(*l*)(2)(B), addressing permanency plans, means that the two options are "aligned" such that OCS can seek neither one without first petitioning for termination. Such a reading is not required by the statutory language, and it directly conflicts with the express direction of AS 13.26.045 that the appointment of a guardian

(continued...)

In sum, because Jude's custodial rights had been suspended, the superior court did not err in concluding that it had the authority under AS 13.26.045 to appoint a long-term guardian for Dana.[36]

**B.      The Guardianship Was Not A De Facto Termination That Triggered ICWA's Requirement That The Likelihood Of Harm Be Proven Beyond A Reasonable Doubt.**

Jude argues that even if the guardianship was statutorily authorized, it was a de facto termination of parental rights for which ICWA requires a higher standard of proof. ICWA prohibits termination absent proof "beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[37] Here, the superior court found a likelihood of harm only by the lesser standard of clear and convincing evidence, which is why it refused to terminate Jude's parental rights and ordered a long-term guardianship instead.

ICWA does not separately address guardianships but it does define four types of "child custody proceeding[s]": (1) foster care placement, (2) termination,

---

[35](...continued)
may follow either termination *or suspension* of a parent's custodial rights.

[36]      The State argues that the guardianship order in this case was authorized not only by AS 13.26.045 but also by AS 47.10.110, which addresses the appointment of a guardian "in the course of a [CINA] proceeding." We discussed the relationship between these two laws in *Terry S. v. State, Department of Health & Social Services, Office of Children's Services*, 168 P.3d 489, 495 (Alaska 2007). More recently the legislature enacted AS 47.10.111, which addresses petitions for adoption or legal guardianship of children in need of aid and will govern the course of such proceedings in the future. Ch. 6, § 9, SSSLA 2016.

[37]      25 U.S.C. § 1912(f).

(3) preadoptive placement, and (4) adoptive placement.[38] Included in the definition of "foster care placement" is "any action removing an Indian child from its parent . . . for temporary placement in . . . the home of a guardian . . . where the parent . . . cannot have the child returned upon demand, but where parental rights have not been terminated."[39] The Winsomes' guardianship of Dana meets this definition: Dana is being kept from her father's home;[40] she will be placed temporarily[41] in the home of a guardian; Jude cannot have her returned upon demand; and Jude's parental rights have not been terminated.[42]

In support of his argument that the guardianship effectively terminated his parental rights, Jude points to our decision in *D.H. v. State*.[43] In that case the State allowed three children in need of aid to move to Alabama with their foster family.[44] We held that "[a] termination of visitation rights exists not only where the state formally

---

[38] 25 U.S.C. § 1903(1).

[39] 25 U.S.C. § 1903(1)(i).

[40] *See* CINA Rule 10.1(b) (requiring compliance with ICWA where a court "is authorizing an Indian child's removal . . . or *continuing a previous order* authorizing removal" (emphasis added)).

[41] Although the guardianship is long-term, it is not permanent; it can be terminated by court order. *See* AS 13.26.085.

[42] *See Terry S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 168 P.3d 489, 495 (Alaska 2007) (observing that under ICWA "the appointment of a guardian constitutes a 'foster care placement' "). This interpretation is also consistent with the commentary to the new ICWA regulations. Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778, 38,798 (June 14, 2016) ("Where a guardianship meets [the foster care placement] criteria, it is subject to applicable ICWA requirements for child-custody proceedings.").

[43] 723 P.2d 1274 (Alaska 1986).

[44] *Id.* at 1275.

obtains a termination order but also where the state's decision as a practical matter precludes the parent from exercising his or her right of reasonable visitation."[45] Because the father was "unemployed and virtually penniless" and "lack[ed] the funds to call regularly," we held that the out-of-state foster care arrangement "constitute[d] a de facto termination of [the father's] visitation rights."[46] Jude argues that if the foster care placement in *D.H.* qualified as a de facto termination, then "surely [the] more permanent and formal break of parental rights . . . in this case" by the guardianship order must do so too.

But the de facto termination in *D.H.* was of only one parental right, albeit an important one: the right of reasonable visitation. Whether the out-of-state placement constituted a de facto termination of *all* the father's parental rights was not at issue. In another case, *Nelson v. Jones*, we declined to find a de facto termination of all parental rights even where the superior court denied a father any visitation until he admitted that he had sexually abused one of his children.[47] We concluded that "the trial court's restriction on visitation [was] not, in effect, a termination of [the father]'s parental rights."[48]

Jude also asserts that the guardianship order "ends OCS's custody over Dana" and "changes the legal standard" by which he can regain custody, because under AS 13.26.085,[49] in order to end the guardianship, he must now carry the burden of

---

[45]    *Id.* at 1277.

[46]    *Id.* at 1276-77.

[47]    944 P.2d 476, 479-80 (Alaska 1997).

[48]    *Id.* at 480.

[49]    AS 13.26.085 was renumbered in 2016 as AS 13.26.186; its text remains
(continued...)

-15-                                                    **7168**

proving "that removing Dana from the Winsomes' care would be in Dana's best interests." But the fact that the guardianship modified Jude's legal rights is not enough to make it a "termination" under federal law. ICWA recognizes that any "foster care placement" modifies parental rights, in that "the parent . . . cannot have the child returned upon demand."[50] But as OCS points out, if Jude petitions the court for the guardians' removal, the outcome could be "the return of Dana to Jude — something that would not be possible if Jude's parental rights were terminated and Dana were adopted."[51]

Because guardianship is a foster care placement under ICWA, the superior court was required to support the guardianship order "by clear and convincing evidence that [the father]'s continued custody of his children was likely to result in serious emotional or physical damage to them."[52] The court did not err by applying this standard when it ordered the guardianship for Dana.

---

[49](...continued)
the same.

[50]    25 U.S.C. § 1903(1)(i); *see also Dep't of Human Servs. v. J.M.*, 338 P.3d 191, 202 (Or. App. 2014) (holding that a change in a child's permanency plan did not qualify as a foster care placement under ICWA because it "did not involve the 'significant shift in legal rights' that occurs when a guardianship is established").

[51]    *See* AS 25.23.130 (providing that an adoption decree will "relieve the natural parents of the adopted person of all parental rights and responsibilities, and . . . terminate all legal relationships between the adopted person and the natural parents . . . so that the adopted person thereafter is a stranger to the former relatives for all purposes"); *In re K.L.J.*, 813 P.2d 276, 279 n.2 (Alaska 1991) ("The effect of an adoption is to permanently terminate the legal relationship of parent and child, except when the natural parent is the spouse of the adopting parent." (quoting *Delgado v. Fawcett*, 515 P.2d 710, 711 (Alaska 1973))).

[52]    *Terry S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 168 P.3d 489, 496 (Alaska 2007); 25 U.S.C. § 1912(e) (2012).

**C.    The Superior Court Did Not Err In Its Findings Of Active Efforts, But Its Findings As To Whether Those Efforts Succeeded And Whether Dana Faces Harm If Returned To Jude's Custody Lack The Required Expert Support.**

The superior court was required to make three factual findings to support the guardianship: (1) by clear and convincing evidence that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful";[53] (2) by clear and convincing evidence, supported by expert testimony, that "custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child";[54] and (3) by a preponderance of the evidence that the appointment of a guardian is in the child's best interests.[55] Jude argues that the court erred both because the evidence does not show that ICWA's requirement of "active efforts" was satisfied and because the court's "substantial harm" and "best interests" findings are not supported by the record. We agree in part.

---

[53]     25 U.S.C. § 1912(d); *cf.* CINA Rule 81(c)(2)(B) (establishing a clear and convincing standard for active efforts in termination proceedings).

[54]     25 U.S.C. § 1912(e).

[55]     In support of this third requirement the superior court cited *C.W. v. State*, 23 P.3d 52, 57 (Alaska 2001), which relied on the CINA statutes' guardianship provision, AS 47.10.110. A best interests finding is also required by AS 13.26.147(b) (formerly AS 13.26.060(b)). We note that AS 13.26.147(b) requires other findings as well, including that venue is proper, the person seeking appointment as guardian is qualified to act as one, and the required notices were given. Jude does not allege any error related to these findings.

### 1. The superior court did not err in finding active efforts, but its finding that they were unsuccessful requires reconsideration on remand.

Under ICWA, "[a]ny party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child . . . shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[56] "The determination of active efforts is done on a case-by-case basis."[57] "Although 'no pat formula exists for distinguishing between active and passive efforts,' distinctions do exist."[58] "[A]ctive efforts require taking a parent through the steps of a plan and helping the parent develop the resources to succeed; drawing up a case plan and leaving the client to satisfy it are merely passive efforts."[59] "Whether OCS made active efforts to provide remedial and rehabilitative services designed to prevent the breakup of the Indian family is a mixed question of fact and law."[60]

Jude argues on appeal that (a) the superior court should not have considered efforts provided by entities other than OCS; (b) considering only OCS's efforts, there

---

[56]     25 U.S.C. § 1912(d).

[57]     *N.A. v. State, DFYS*, 19 P.3d 597, 603 (Alaska 2001).

[58]     *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 763 (Alaska 2009) (quoting *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999)).

[59]     *Id.* (citing *A.A.*, 982 P.2d at 261).

[60]     *Chloe O. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 309 P.3d 850, 856 (Alaska 2013) (citing *Pravat P. v. State, Dep't of Health & Soc. Servs.*, 249 P.3d 264, 270 (Alaska 2011)).

was insufficient evidence that active efforts were made; and (c) active efforts, if made, were successful in rehabilitating him.

### a. The superior court did not err by considering efforts made by entities other than OCS.

The superior court's active efforts finding relied in part on sex offender treatment provided by the federal treatment center in Devens. According to Jude, however, ICWA requires that OCS make all qualifying efforts itself; otherwise, he argues, OCS will be "incentiviz[ed] . . . to act passively" while letting others carry the burden of rehabilitation, "which runs counter to ICWA's text and purpose." Because Jude's argument asks whether the superior court's findings complied with ICWA, we consider it de novo.[61]

ICWA requires the party seeking a foster care placement to satisfy the court that "active efforts have been made";[62] it does not say who must make the efforts. We have approved superior courts' consideration of efforts made by outside entities such as the Alaska Department of Corrections, parole officers, and therapeutic courts.[63] We have also noted that "the practical circumstances surrounding a parent's incarceration — the difficulty of providing resources to inmates generally, the unavailability of specific resources, and the length of incarceration — may have a direct bearing on what active

---

[61] *Tessa M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 182 P.3d 1110, 1114 (Alaska 2008) ("Whether a trial court's findings are consistent with the child in need of aid statutes is a question of law that we review de novo.").

[62] 25 U.S.C. § 1912(d).

[63] *See, e.g.*, *Claudio P. v. State, Dep't of Health and Soc. Servs., Office of Children's Servs.*, 309 P.3d 860, 865 (Alaska 2013) (Department of Corrections efforts); *Jon S.*, 212 P.3d at 765 (parole officer efforts); *Denny M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 365 P.3d 345, 350 (Alaska 2016) (therapeutic courts).

remedial efforts are possible."[64]  In *A.M. v. State*, for example, we upheld the superior court's active efforts finding in part because of services provided by the Department of Corrections, concluding that "[the father]'s enrollment in the DOC programs necessarily reduced [OCS]'s role in providing active remedial efforts."[65]

Although *A.M.* and other past cases have considered efforts made by various entities of the State of Alaska,[66] the rationale extends to services provided by others that OCS should not be required to duplicate.  It is unrealistic to expect OCS to provide rehabilitative sex offender treatment to a federal prisoner, housed out of state, while that prisoner is already engaged in a federal program of intensive sex offender therapy.[67]  Considering Jude's treatment at Devens in the court's active efforts analysis was not error.

---

[64]    *A.A.*, 982 P.2d at 261; *see also Jon S.*, 212 P.3d at 763 n.26 ("Although incarceration does not absolve the state's active efforts duty, the court may consider the impact of incarceration on the possibility of active remedial efforts.").

[65]    945 P.2d 296, 306 (Alaska 1997).

[66]    *Jon S.*, 212 P.3d at 763-64 ("In evaluating whether the state has met its active efforts burden, we look 'to the state's involvement in its entirety.' " (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268-69 (Alaska 2008))).

[67]    *See A.M.*, 945 P.2d at 306 ("Active intrusion by [OCS] into DOC's therapeutic programs would have been inappropriate and unreasonable, if not impermissible as a matter of law and impossible as a matter of practical reality.").  Other courts agree with our recognition of the practical difficulties involved in providing services to a parent incarcerated in another state. *Loren R. v. Ariz. Dep't of Econ. Sec.*, No. 1 CA-JV 12-0158, 2013 WL 119664, at *1 (Ariz. App. Jan. 10, 2013) (citing *A.A.*, 982 P.2d at 261, among others); *In re Cari B.*, 763 N.E.2d 917, 924 (Ill. App. 2002) (citing *A.M.*, 945 P.2d at 305-06, among others).

**b.** **The superior court did not err by finding that active efforts were made.**

We review in their entirety the efforts made to prevent the breakup of Jude's family, focusing first on the period of Jude's incarceration and then on the period following his release.[68] Although Jude asserts that "the record does not support the court's finding regarding active efforts," his argument focuses not on specific factual errors but on whether the efforts satisfy the ICWA standard. This presents a question of law.[69] We conclude that OCS satisfied the active efforts requirement.

**i.** **Jude's incarceration**

Jude was arrested in late 2009 and sentenced in August 2010. OCS took custody of Dana in April 2011 and still had custody of her when Jude was released from the Anchorage halfway house in May 2014. The evidence supports the superior court's finding that active efforts were made during this time.

As noted above, Jude received intensive sex offender rehabilitation treatment while at Devens, and he also participated in parenting and anger management classes. He was able to send Dana gifts and letters and had regular telephone contact with her while she lived with the Carelawns and the Winsomes. OCS apparently had no role in facilitating these contacts, though it "provided [Mr. Carelawn] guidance" in initiating the telephone calls and at one point gave the Carelawns advice as to whether they should continue. Still, the superior court "assign[ed] significant weight to the fact that this telephone contact was consistent and continuing." While Jude had no in-person visitation with Dana while at Devens, "[w]e have previously found that telephonic visits

---

[68] *Jon S.*, 212 P.3d at 763-64 (quoting *Maisy W.*, 175 P.3d at 1268-69).

[69] *Tessa M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 182 P.3d 1110, 1114 (Alaska 2008).

with an incarcerated parent satisfied the active efforts requirement."[70]  And we are reluctant to say that "active efforts" requires sending a child across the country to visit an incarcerated parent.

Jude emphasizes the minimal efforts his OCS caseworkers made to contact him while he was in prison, but the evidence supports a conclusion that this was due at least in part to the logistical challenges of his incarceration.[71]  The scope of the active efforts requirement was necessarily narrowed by these "practical realit[ies]."[72]  OCS's involvement during this time was minimal but not dissimilar to what we have found adequate in the past.  In *A.M.* we upheld an active efforts finding where the father received sex offender treatment in a state prison and the child protection agency "maintained contact with [the father] while he was in treatment, generally encouraged his treatment efforts, and assisted him in arranging visitation with his children."[73]  In *Dashiell R. v State,* we upheld an active efforts finding where the father received classes and therapy while incarcerated, "OCS staff communicated with [the father] during his incarceration," and "OCS arranged for written exchanges and telephone visits between [the father] and the children."[74]  Like the parents in *A.M.* and *Dashiell R.*, Jude received treatment while incarcerated and had regular contact with his child by telephone and

---

[70]     *David S. v. State, Dep't of Health & Soc. Servs.*, 270 P.3d 767, 778 (Alaska 2012) (citing *Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 844, 850 (Alaska 2009)).

[71]     These included the facility's anti-virus software, which interfered with email communication, and time limits on phone calls.  Jude admitted that "[t]he phone system in prison is very hard to deal with."

[72]     *A.M.*, 945 P.2d at 306.

[73]     *Id.*

[74]     222 P.3d at 850.

letter; unlike in those cases, OCS in this case had little involvement in these efforts but nonetheless was not required to duplicate them. We conclude that the superior court did not err when it included these facts in the necessary active efforts.

## ii.    After Jude's release

In the few months between Jude's release in early 2014 and Dana's May 2014 move out of state, OCS worked on Jude's case plan, referred him to parenting classes, and helped him to continue sex offender treatment. He had supervised contact with Dana during family therapy sessions and at OCS.

After Dana's move, OCS caseworker Eryne Hughes kept in touch with Jude by email and had at least three meetings with him between November 2014 and the second termination trial in late 2015. OCS set up a risk assessment for Jude with Dr. Lazur to determine whether he could safely gain his daughter's custody.

At the time of the second termination trial Jude was having telephone contact with Dana every Sunday, and OCS was communicating with Jude and the Winsomes about continuing these contacts. OCS had not paid for in-person visitation, but Dana's therapists were recommending against it at that time. One of the therapists, Lisa Merz, testified that she needed to work with Jude before signing off on in-person visitation, but Jude's refusal to schedule a phone call or visit Merz hindered progress. When Jude failed to schedule the call during Merz's business hours, OCS caseworker Hughes emailed him in an attempt to ease tensions and "let[] him know that he really needs to do what [Dana's] clinician is asking of him." By the time of the second termination trial Jude still had not scheduled the telephone call, though he had left Merz a voicemail. He told Hughes that he could not afford to miss work or travel out of state; Hughes, on the other hand, testified that he could afford it but had told her the trip would be a waste of time without a guarantee of seeing his daughter. The superior court credited Hughes's testimony on this issue because "evasiveness and some defensiveness"

were a "fairly recurrent aspect of [Jude's] testimony." Jude does not directly challenge this finding of fact.

We have held consistently that "[t]he active efforts requirement does not require perfection."[75] While OCS's efforts here may have "fall[en] short of exemplary,"[76] we conclude that the superior court did not err in finding that the "active efforts" requirement was satisfied.

### c. The superior court's finding that active efforts were unsuccessful requires reconsideration on remand.

The superior court found that although Jude has "complied with all of the [OCS] plan requirements," it could not "declare [Jude]'s recovery a success at this time." Jude argues that this is clearly erroneous; he contends that if active efforts were made they succeeded in rehabilitating him, allowing for the reunification of his family.

ICWA does not define "success" in the active efforts context. Jude argues in effect that efforts succeed when the parent completes each element of a case plan "to satisfaction." But completion alone cannot define success. We have held that "[c]ompliance with treatment plans does not guarantee that parental rights will not be terminated because it cannot guarantee that adequate parenting skills will be acquired from the treatment regimen."[77] In *V.S.B.* we upheld termination of a mother's parental

---

[75] *Philip J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 314 P.3d 518, 530 (Alaska 2013) (quoting *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 272 (Alaska 2011)).

[76] *Thomas H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 184 P.3d 9, 16 (Alaska 2008); *see also Philip J.*, 314 P.3d at 530 ("[T]he fact that OCS could have done more does not undermine the other active efforts that OCS made.").

[77] *V.S.B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth* (continued...)

rights even where she was able to "reduce the risk of an episode of Bipolar Disorder down to one mild episode in a ten-year span" and "[she] ha[d] done all that ha[d] been asked of her and there [was] nothing in the record to suggest that [she was] being insincere in her attempts at rehabilitation."[78] Although OCS had helped the mother complete parenting classes and mental health treatment, we upheld the superior court's determination that "[her] parenting skills ha[d] only marginally improved and [were] not sufficient to make her an adequate parent."[79]

As in non-ICWA cases, the appropriate question here "is whether [the parent] ha[s] remedied the problems that placed [his] children at risk and gained the necessary skills so that the children could be safely returned to [the parent's] care."[80] The problems need to be not just addressed but "remedied."

And a failure to remedy, when combined with a continuing likelihood of harm to the child, may demonstrate that active efforts did not succeed.[81] The superior

---

[77](...continued)
*Servs.*, 45 P.3d 1198, 1208 (Alaska 2002) (citing *In re T.W.R.*, 887 P.2d 941, 945 (Alaska 1994)); *see also Barbara P. v. State, Dep't of Health & Soc. Servs.*, 234 P.3d 1245, 1260 (Alaska 2010) ("[C]ompletion of a case plan [in a non-ICWA case] does not guarantee a finding that [a parent] has remedied [his] conduct.").

[78]     *V.S.B.*, 45 P.3d at 1207.

[79]     *Id.*

[80]     *Barbara P.*, 234 P.3d at 1260; *In re J.S.*, 321 P.3d 103, 110 (Mont. 2014) (observing that the goal of active efforts in an ICWA case is "to avoid the breakup of Indian families whenever possible by providing services designated to remedy problems which might lead to severance of the parent-child relationship" (quoting *In re G.S.*, 59 P.3d 1063, 1072 (Mont. 2002))).

[81]     *Thomas H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 184 P.3d 9, 17 (Alaska 2008) (holding that the trial court's "analysis [regarding
(continued...)

court found this combination of factors here. However, as discussed in the section that follows, the superior court's finding of a likelihood of harm rests in part on considerations that lack support in the expert testimony. Because the court must reconsider on remand whether the evidence supports a likelihood of harm, it must also reconsider whether the active efforts in this case were unsuccessful.

>    **2.    One aspect of the superior court's finding that Dana would likely suffer serious emotional or physical damage in Jude's custody lacks support in the expert testimony.**

Before appointing a guardian under ICWA the superior court "was required to find by clear and convincing evidence that [Jude]'s continued custody of [Dana] was likely to result in serious emotional or physical damage to [her]."[82] Whether returning a child to the parent would likely cause harm is a question of fact,[83] but whether the findings comport with statutory requirements is a question of law.[84] The clear and convincing evidence of harm necessary to support a guardianship must include

---

[81](...continued) harm], coupled with [its] holding . . . that [the father] failed to remedy his conduct within a reasonable time, disposes of th[e] argument [that active efforts were successful]"); *see also Carl N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 102 P.3d 932, 936-37 (Alaska 2004) (affirming a finding of likelihood of harm in part by relying on the parent's failure to remedy).

[82]    *See Terry S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 168 P.3d 489, 496 (Alaska 2007); 25 U.S.C. § 1912(e).

[83]    *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 270 (Alaska 2011).

[84]    *C.J. v. State, Dep't of Health & Soc. Servs.*, 18 P.3d 1214, 1217 (Alaska 2001).

"testimony of qualified expert witnesses."[85]  But ICWA "does not clarify the scope of the expert testimony required, nor does it require that the expert testimony provide the sole basis for the court's conclusion."[86]  We have interpreted ICWA to require that "[t]he expert testimony constitute[] some of the evidence upon which the judge bases this finding.  But it does not need to be the sole basis for that finding; it simply must support it."[87]

As an alternative to Jude's argument that the finding of harm required proof beyond a reasonable doubt (addressed above in Section IV.B), Jude contends that the finding was not supported by clear and convincing evidence.  The superior court based its finding of harm on three "considerations":  (1) that Jude "still poses a significant risk of re-offense"; (2) that "there are good reasons to be cautious" about reunifying Jude with Dana given his extensive sexual history with relatives and teens and "the fact that [Dana] will be a teenager in six years"; and (3) Jude's "inability to meet [Dana's] caregiving needs."

Jude first asserts that the superior court's decision that he "poses a significant risk of re-offense" is in stark contrast with the expert testimony, pointing to Dr. Lazur's testimony that he is a "poster boy for sex offender treatment" because of his desire to  make positive changes in his life.[88]  Dr. Lazur concluded that the risk Jude will

---

[85]  25 U.S.C. § 1912(e).  As noted above, the term "foster care placement" in the act is defined to include guardianships.  *See* 25 U.S.C. § 1903(1)(i).

[86]  *Diana P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 355 P.3d 541, 547 (Alaska 2015) (first citing 25 U.S.C. § 1912; then citing *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 992 (Alaska 2002)).

[87]  *Marcia V. v. State*, 201 P.3d 496, 508 (Alaska 2009).

[88]  The superior court recognized Dr. Lazur as an expert in the psychological
(continued...)

sexually reoffend within five years was approximately 6%; he called this a "moderate risk." Dr. Blair placed Jude in the "low moderate" risk category, at 2.8%.[89] The superior court, however, found Jude's risk of reoffense to be "significant" under the circumstances.

Jude takes issue with the term "significant," analogizing that "[i]f a weather forecast calls for a 6 percent chance of rain, one would never say there is a 'significant' chan[c]e of rain." OCS responds that "[a] small risk of rain may not warrant an umbrella, but a small risk that a child will be sexually abused may be cause for serious concern." We agree that the significance of the risk depends in part on the seriousness of the harm to be avoided. And deciding whether a particular risk is significant in the context of a child in need of aid case is for the court, even if that risk has been quantified by an expert witness.[90] We cannot say that the superior court clearly erred when it found that Jude posed a "significant" risk of sexual reoffense.

We are more concerned with the court's second consideration: that because of Jude's sexual history, the risk of sexual offense encompasses Dana as a possible victim. Dr. Lazur testified that the risk Jude would sexually offend *with his daughter* was essentially nonexistent. He testified that "there's no evidence, either from the test data, the risk assessment, my judgment of looking at him and seeing where he is and seeing

---

[88](...continued)
evaluation and treatment of sex offenders and risk assessments of sex offenders.

[89]    The superior court recognized Dr. Blair as an expert in the field of sex offender treatment.

[90]    *Diana P.*, 355 P.3d at 546-47 ("The findings of a likelihood of serious emotional or physical damage are findings that must be made by the trial judge, not the expert witness." (quoting *Marcia V.*, 201 P.3d at 508)). Though an expert witness such as Dr. Blair or Dr. Lazur is in the best position to estimate the risk of sexual reoffense, it is up to the superior court to determine whether that risk is significant in the context of a CINA case.

what he's doing, that he poses a danger" to Dana. His opinion was based on Jude's age, "awareness[,] and ability to control his drives" and also on Jude's "very different" relationships with his former sexual partners — whom he viewed as "people of convenience" there to "serve his needs" — and with his daughter, whom he was motivated to care for as a parent. Dr. Blair deferred on this issue to Dr. Lazur. In short, the superior court's conclusion that Dana was at risk of sexual abuse by her father finds no support in the expert testimony given at trial.

The court's remaining concern, however — Jude's "inability to meet [Dana's] caregiving needs" — is well supported by the evidence. The court found that Jude "is simply not the kind of caregiver [Dana] needs right now." The court referred to the testimony of Dana's therapist, Merz, who testified that Jude "has displayed a pattern of failing to understand [Dana's] past traumas and does not understand the child's fears and anxieties."[91] Merz identified these traumas, fears, and anxieties as including Dana's sexual abuse by her cousin, a "sense of abandonment and loss" due to early childhood neglect and Jude's incarceration, and abusive experiences when she lived with the Carelawns, as well as a general "fear of the unknown." She testified that Dana "is very vulnerable to potential abusive situations in the future." She testified that Dana needs a "secure attachment" to her caregiver, to include "a predictable environment," responsiveness to Dana's "emotional needs," and the practical ability to meet the daily routines of child care. Merz testified that Dana had "formed a secure attachment with" the Winsomes and that Natalia Winsome was particularly "attuned to [Dana's] emotional needs" and an essential part of the child's ongoing therapy.

The court found that Jude, in contrast, "is neither legally nor psychologically capable of parenting [Dana]." It found that despite Jude's positive response to treatment,

---

[91] Merz was qualified as an expert in mental health counseling.

he continued to "put[] his own needs and desires first."  The court noted the "narcissistic personality traits" observed by both Dr. Blair and Dr. Lazur and that Jude continued to exhibit those traits at trial.  Merz's testimony supported these findings; although she had had no direct contact with Jude, she reported that his telephone calls gave Dana "a big increase in anxiety and uncertainty" in part because of Jude's failure to recognize that his promises about their future together aggravated Dana's "fear of the unknown."

The superior court also discussed the emotional impact on Dana of any transition from the "permanency and stability" of the Winsomes' home to the uncertainty of reunification with Jude.  It noted that Jude was currently barred by law "from having unsupervised [contact] with anyone under the age of eighteen"; that both Dr. Lazur and Dr. Blair testified about the necessity of a slow reintroduction, with "a detailed transition plan with safeguards"[92]; and that because of this, Dana would not be able to live with Jude even after moving back to Alaska, meaning that "it will be some time before she and [Jude] can form a meaningful parent-child relationship."  The court concluded that "any move from [the Winsomes' home state] to Alaska is likely to be disruptive to [Dana]."

In granting the guardianship, therefore, the court decided that Dana should remain with the Winsomes until Jude's "likelihood of relapse decreases," noting Dr.

---

[92]     Dr. Lazur's and Dr. Blair's opinions about the necessity of a transition period were not based on a sexual risk that Jude posed to Dana.  Dr. Lazur's discussion of the transition period was based on the general need for a parent and child, long separated, to get to know each other, and Jude's need for time to figure out how to be a parent.  Dr. Lazur was asked, "[W]hat I'm getting is that the primary basis for those ideas and recommendations for the transition is not the risk of reoffense, but related to re-familiarization in the parenting . . . issues that need to be worked out," and he answered, "Exactly."  As for Dr. Blair, his testimony about a necessary transition period was based in part on what he understood to be the conditions of Jude's probation and in part on what he understood to be OCS's typical practice in reunifying families.  He repeatedly deferred to Dr. Lazur as to whether Jude posed a risk of sexual reoffense to Dana.

Lazur's testimony that Jude's statistical risk of reoffending will drop by 50% five years after his release from prison. The court noted that Jude "may be ready to act as [Dana's] father if he continues to progress." But it also noted its continuing concern with how Jude's narcissistic personality traits might impact his "ability to place [Dana's] needs before his own" and his minimalization of some of his past transgressive behavior.

In sum, we see no clear error in the superior court's conclusions (1) that Jude's risk of sexual reoffense is "significant"; (2) that Jude is currently unable to meet Dana's needs as her caregiver; and (3) that moving Dana from her secure environment with the Winsomes to a transitional setting with her father in Alaska would be disruptive and emotionally damaging. But given the expert testimony requirement of ICWA, it was error to rely on Jude's sexual history and risk of sexual reoffense as posing a particular danger to Dana; this conclusion is not supported by the expert testimony.[93] The court relied on all these factors in combination to find the likelihood of harm. Because the question of likely harm is one of fact,[94] we remand for the superior court to consider whether, consistent with our discussion above, there remains "clear and convincing evidence, including testimony of qualified expert witnesses," that returning Dana to Jude's custody will cause her serious emotional or physical damage.

### 3. The superior court did not abuse its discretion by finding that guardianship was in Dana's best interests.

To support a guardianship order under AS 13.26.060(b) a court must find that "the welfare and best interests of the minor will be served by the requested

---

[93]    *See* 25 U.S.C. § 1912(e) (requiring "a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child").

[94]    *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 270 (Alaska 2011).

appointment." Jude challenges the court's best interests finding in this case first because of the risk of sexual abuse posed by Natalia's son Roland. The superior court found that "in spite of the risk that [Roland] will likely return to the [Winsome] house, . . . guardianship with the [Winsomes] would adequately protect [Dana] from additional physical or psychological harm."

The record supports this finding. A number of witnesses testified that the Winsomes responded immediately and appropriately to Dana's report of abuse. The entire family participated in a program called RSafe, which included individual treatment for both Roland and Dana. Witnesses confirmed that because the reparation goal of RSafe "is always victim-centered," any decision about whether Roland returns to the Winsome home will be based on the therapeutic recommendations for Dana.

The court also heard evidence of the small reoffense rate for child offenders generally (because they are driven by different impulses than adults are) and for RSafe graduates in particular. The court also reasoned that living in a household supervised by the adult Winsomes, even if Roland were living there too, would be a more normal family dynamic than returning to Alaska, where a "workable transition plan" had yet to be developed.

Finally, Jude relies on testimony that the Winsomes asked Dana to call them "Mom" and "Dad" in order to avoid confusing their younger son; according to Jude, "[t]his demonstrated both a desire to replace Jude with Mr. Winsome" and a failure to prioritize Dana's needs over this "minor concern" for their son. We understand why Jude would find this troubling, but the superior court does not appear to have addressed it, and given the court's other best interests findings it is very unlikely to have made a difference.

Importantly, the court found that the Winsomes provide Dana a stable environment;[95] in contrast, her therapists testified that transitioning her to her father's care, at this stage in his rehabilitation, would be a long-term and uncertain process likely to cause her emotional harm.[96]

We conclude that the superior court did not abuse its discretion by concluding that guardianship was in Dana's best interests.

## V.     CONCLUSION

The superior court's long-term guardianship order is VACATED. The case is REMANDED for reconsideration of whether clear and convincing evidence, including the testimony of qualified expert witnesses, supports a finding that Dana would likely suffer serious emotional or physical damage if placed in Jude's custody

---

[95]     *See* AS 47.05.065(4)(A) – (B) (stating that "the child should be placed in a safe, secure, and stable environment" and "the child should not be moved unnecessarily").

[96]     Such a move would currently require two transitions:  one from the Winsomes to a temporary placement in Alaska, then, assuming that Jude progresses appropriately with his rehabilitation, another from that placement to his home.

STOWERS, Chief Justice, with whom WINFREE, Justice, joins, concurring in part and dissenting in part.

I disagree with this court's resolution of the likelihood of harm issue.[1] Looking at the superior court's findings in their totality, it is clear to me that the superior court was not clearly mistaken in finding that Jude presents a substantial likelihood of harm to his daughter, given, among other things, the testimony of the daughter's therapist (Merz), who — as this court observes in its opinion at page 29 — "testified that Jude 'has displayed a pattern of failing to understand [Dana's] past traumas and does not understand the child's fears and anxieties.' " This court's discussion at page 29-30 buttresses the superior court's finding on this issue.[2]

---

[1]     "Whether a child would likely suffer serious physical or emotional harm if returned to a parent's custody is a question of fact." *Chloe O. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 309 P.3d 850, 855 (Alaska 2013)  (citing *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 270 (Alaska 2011)).  "In child in need of aid cases, 'we review the trial court's factual findings for clear error . . . .' " *Emma D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 322 P.3d 842, 849 (Alaska 2014) (quoting *Chloe O.*, 309 P.3d at 856).  "We will find clear error only when a review of the entire record leaves us 'with a definite and firm conviction that the [trial court] has made a mistake.' " *David S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 270 P.3d 767, 774 (Alaska 2012) (citing *S.H. v. State, Dep't of Health & Social Servs., Div. of Family & Youth Servs.*, 42 P.3d 1119, 1122 (Alaska 2002)).

[2]     This court explains at pages 29-30 of the opinion:  "The [superior] court found that Jude . . . 'is neither legally nor psychologically capable of parenting [Dana].' It found that despite Jude's positive response to treatment, he continued to 'put[] his own needs and desires first.'  The court noted the 'narcissistic personality traits' observed by both Dr. Blair and Dr. Lazur and that Jude continued to exhibit those traits at trial. Merz's testimony supported these findings; although she had had no direct contact with Jude, she reported that his telephone calls gave Dana 'a big increase in anxiety and uncertainty' in part because of Jude's failure to recognize that his promises about their

(continued...)

It does not matter that this testimony came from the daughter's therapist as opposed to Drs. Blair and Lazur. Merz's testimony is directly relevant to the issue and is compelling. Under our precedent the superior court is permitted to aggregate other testimony with expert testimony,[3] and the court did consider the expert testimony of Drs. Blair and Lazur. And while one might, looking at their testimony alone, find that the likelihood of the father molesting his daughter is slight, the court is not limited to considering their testimony in isolation, nor is the likelihood of the father molesting his daughter the only consideration in determining whether there is a likelihood of harm to the daughter if she were placed with her father. The testimony of Merz addressed other serious concerns about the daughter's problems and needs and is more than sufficient to support the trial court's factual finding that there is a serious likelihood of harm if the daughter were placed in her father's custody. Thus, I dissent from this court's decision on this issue.

I concur with the remainder of this court's opinion and believe the superior court's order granting the long-term guardianship should be affirmed.

---

[2](...continued)
future together aggravated Dana's 'fear of the unknown.' "

[3]     *See Diana P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 355 P.3d 541, 547 (Alaska 2015) ("While ICWA requires that the evidence supporting [the finding that continued custody is likely to cause serious harm to the child] include expert testimony, it does not . . . require that the expert testimony provide the sole basis for the court's conclusion.").