**TERRY S., Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, Appellee.**

No. S–12463.

Supreme Court of Alaska.

Sept. 28, 2007.

**30.** *Alderman v. Iditarod Props., Inc.,* 104 P.3d 136, 145–46 (Alaska 2004).

Kenneth C. Kirk, Kenneth Kirk & Associates, Anchorage, for Appellant.

Mary Ann Lundquist, Assistant Attorney General, Fairbanks, and Talis J. Colberg, Attorney General, Juneau, for Appellee. Lisa B. Nelson, Anchorage, for Guardian Ad Litem.

Before: FABE, Chief Justice, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

FABE, Chief Justice.

## I. INTRODUCTION

Terry S. appeals a number of orders stemming from a guardianship case involving his three children. We conclude that the superior court did not err in (1) rejecting Terry's motion to disqualify the superior court judge presiding over the case; (2) finding by clear and convincing evidence that Terry's continued custody of the children would result in serious emotional or physical damage to the children; (3) requiring Terry to participate in sex offender treatment before being allowed visitation with his children; or (4) failing to apply the "beyond a reasonable doubt" standard to its findings. We therefore affirm the superior court's decisions and orders in all respects.

## II. FACTS AND PROCEEDINGS

### A. Facts

Terry S. and Veronica L. had three daughters together. At the time this appeal was briefed, the oldest daughter, Jodi L., was sixteen years old; Tania L. was twelve; and Bobbi L. was eight.[1] All three children are Indian children within the meaning of the Indian Child Welfare Act.

The family life of Terry, Veronica, and their children was tumultuous. Terry and Veronica's relationship was "on again off again." The children lived with both parents, together and separately, moving frequently and often unexpectedly. There were multiple allegations that both parents had engaged in substance abuse and that Terry had engaged in domestic violence. On three separate occasions, Veronica filed for re-

straining orders against Terry. And, most relevant to this appeal, on May 28, 2003, the eldest daughter, Jodi, reported that Terry had sexually abused her. According to Jodi, Terry molested her two times, warning her each time that her mother would be harmed or die if Jodi told anyone about the incidents. Terry denied and continues to deny that these incidents occurred.

On September 5, 2003, Veronica died unexpectedly. On the same day, the Office of Children's Services (OCS) took emergency custody of all three children and placed them with their maternal grandmother. According to OCS's child in need of aid (CINA) petition, emergency custody was justified by the mother's death and Terry's history of "domestic violence, assault, substance abuse, and sexual abuse of his oldest daughter."

### B. Proceedings

#### 1. The CINA case

On January 23, 2004, Terry entered into a stipulation and order in open court before Superior Court Judge Sharon L. Gleason. At the outset of this stipulation, Terry agreed, "without admitting any criminal act," that his children were children in need of aid because they had been "exposed to domestic violence" and because Jodi had "disclosed sexual abuse by her father." Terry, however, expressly "denie[d] the sexual abuse."

The stipulation and order then went on to note that the superior court had found by clear and convincing evidence that the children would likely "suffer serious emotional or physical damage if left in the custody of the father"; that OCS would retain temporary custody of the children; that the children would continue in their placement with their maternal grandparents; and that OCS had devised a case plan for family reunification that all parties agreed was reasonable.

As part of OCS's case plan, Terry was required to "participate in a sexual offender/mental health assessment and comply with any treatment recommendations." Terry agreed in the stipulation and order that this case plan was in the best interests of his

1. We use pseudonyms for all family members to protect their privacy.

children and expressed his intention "to work on a reunification plan to regain custody of [Tania and Bobbie]." He noted, however, that he "underst[ood] and respect[ed] [Jodi's] wish not to live with him at the present time."

After the stipulation and order was entered, the guardian ad litem (GAL) moved the superior court for a factual finding by clear and convincing evidence that Terry had in fact sexually abused Jodi. Terry objected, arguing that he had not had an opportunity to present evidence due to the execution of the stipulation and order. To address this concern, the superior court scheduled an evidentiary hearing at which Terry and all other parties would be afforded an opportunity to present additional evidence.

The evidentiary hearing took place as scheduled, but neither Terry nor any other party presented additional evidence. As a result, the superior court ultimately found by a preponderance of the evidence that Terry had sexually abused Jodi. The superior court did not, however, make this finding by clear and convincing evidence.

In April 2004 the superior court held a disposition hearing. A month after this hearing, the superior court issued an order in which it found that OCS was making reasonable efforts to provide remedial services and rehabilitative programs to reunify the family; that although the father was in compliance with OCS's case plan, OCS's efforts at reunification had not yet proven successful; and that the children would therefore continue in OCS's custody "for a period not to exceed two years."

In November 2004 the superior court held a permanency hearing. After the close of this hearing, the court found that the children continued to be children in need of aid; that efforts to reunify the family had not yet been successful; and that "removal remain[ed] necessary to prevent imminent physical damage or harm to the children."

It then went on to explain that the permanent plan for Jodi was guardianship with her maternal grandmother while the permanent plan for the other two children was reunification with their father "conditioned upon his successful completion of sex offender treatment."

### 2. The guardianship case

On April 1, 2005, OCS filed a petition for guardianship, asking that the children's maternal grandmother be named as all three children's guardian. Although OCS could simply have requested the superior court overseeing the CINA case to appoint a guardian as part of the ongoing CINA proceedings,[2] it instead chose to frame its request as a separate guardianship case under AS 13.26.030–.085.

Because the Public Defender Agency does not have statutory authority to represent parents in guardianship cases,[3] Terry's assistant public defender—who had represented him throughout the entirety of the CINA proceedings—was unable to represent Terry with regard to OCS's efforts to appoint the children's maternal grandmother as guardian. As the assistant public defender noted to the superior court at the time, "[t]he Alaska Public Defender Agency cannot represent parties in a guardianship proceeding." Thereafter, Terry requested and received new court-appointed counsel. On May 18, 2005, attorney Leonard Anderson was appointed as counsel for Terry but withdrew from the case a month later based on an undisclosed conflict. On June 29 attorney Kenneth Kirk was appointed as counsel for Terry and has continued to represent him since.

The guardianship case was initially assigned to Superior Court Judge Morgan Christen, but was soon after administratively reassigned to Judge Gleason—the same judge who was already overseeing the CINA case.[4] On July 7, 2005, shortly after Mr.

---

**2.** AS 47.10.110 provides that if, during the course of a CINA case, "it appears to the court that the welfare of a minor will be promoted by the appointment of a guardian or custodian of the minor's person, the court may make the appointment."

**3.** AS 18.85.100(a).

**4.** As Terry points out, it is not entirely clear how and why the guardianship case was reassigned to Judge Gleason. The reassignment order was only sent to the Attorney General's Office, and no

Kirk was assigned as his counsel, Terry filed a motion to set aside the judicial assignment of Judge Gleason. In this motion, Terry noted that he would have moved to disqualify the judge earlier but had been awaiting counsel. He also noted that this motion should be "count[ed] as [his] one discretionary preemption." In response, OCS filed an opposition to the motion to set aside the judicial assignment, and the GAL moved to consolidate the CINA and guardianship cases. On July 19, 2005, Superior Court Judge Sen K. Tan denied Terry's motion to set aside the judicial assignment. On August 3, 2005, Judge Gleason granted the GAL's motion and consolidated the CINA and guardianship cases.

Terry did not oppose the entry of letters of guardianship for Jodi, which were signed on October 24, 2005. Thereafter, the superior court held a four-day guardianship proceeding with regard to the two other children. On February 9, 2006, the superior court issued a memorandum decision on the issue of guardianship. In this decision, the superior court found by clear and convincing evidence that Terry had sexually abused Jodi. The court then went on to find by clear and convincing evidence that placing the two younger children in Terry's home would likely result in "serious emotional or physical damage to the children." On the basis of this finding, the superior court concluded that the children's maternal grandmother would be appointed guardian as soon as letters of guardianship were filed.

In response to the superior court's decision, Terry moved for clarification on whether the guardian would "have the right to determine whether there should be contact between the children and their father." On May 8, 2006, the superior court entered new letters of guardianship for the two younger children which stated that "[i]f the father of

the child is not satisfied with the amount of visitation allowed, he may petition th[e] court for specific visitation rights." Soon thereafter, Terry petitioned the superior court for specific visitation rights. After further proceedings, the superior court issued an order in which it concluded that Terry was not entitled to visitation, either supervised or unsupervised, until he successfully participates in sex offender treatment.

Terry now appeals.

## III. STANDARD OF REVIEW

█ The proper application of the rule governing the peremptory disqualification of judges in civil cases—Alaska Rule of Civil Procedure 42(c)—is a question of law which we review de novo.[5]

█ "[W]hether substantial evidence supports the [superior] court's conclusion [under the Indian Child Welfare Act] that an Indian child is likely to be seriously harmed if returned to his parent is a mixed question of fact and law."[6]

█ A superior court's factual findings are reviewed under the clearly erroneous standard.[7] A superior court's legal findings are reviewed de novo.[8] "We may affirm a judgment on any grounds that the record supports, even grounds not relied on by the superior court."[9]

## IV. DISCUSSION

Terry raises four arguments on appeal: (1) the superior court erred in denying his motion to disqualify Judge Gleason in the guardianship case; (2) the superior court erred in finding by clear and convincing evidence that Terry's continued custody of the children would result in serious emotional or physical damage to the children; (3) the superior court erred in requiring Terry to par-

other party knew about it. Indeed, the GAL actually requested reassignment of the case to Judge Gleason over a month after the case had already been reassigned to Judge Gleason.

5. *Staso v. State, Dep't of Transp.*, 895 P.2d 988, 990 (Alaska 1995).

6. *E.A. v. State Div. of Family & Youth Servs.*, 46 P.3d 986, 989 (Alaska 2002).

7. *Id.*

8. *Id.*

9. *Van Sickle v. McGraw*, 134 P.3d 338, 341 n. 10 (Alaska 2006).

ticipate in sex offender treatment before being allowed visitation with his children; and (4) the superior court applied the wrong legal standard since the requirement that Terry participate in sex offender treatment amounted to a constructive termination of Terry's parental rights.

## A. The Superior Court Did Not Err in Denying Terry's Motion To Disqualify Judge Gleason in the Guardianship Case.

Alaska Statute 22.20.022 provides for the peremptory disqualification of district court and superior court judges in civil and criminal actions.[10] As we have previously explained, this statute "creates and defines a right—the right to have a fair trial before an unbiased and impartial judge."[11] Although this "substantive right" is statutory in origin, its scope and procedural requirements are controlled in civil cases by Alaska Rule of Civil Procedure 42(c).[12] Rule 42(c) maintains, in relevant part, that "each side [to a civil action] is entitled as a matter of right to a change of one judge and of one master" and that this right may be exercised simply by filing a pleading naming the judge to be changed without specifying any grounds for the change.[13] The rule further specifies that the right to change a judge is waived when a party knowingly participates before that judge in "[a]ny judicial proceeding which concerns the merits of the action and involves

the consideration of evidence or of affidavits."[14]

In the case at hand, Terry argues that the superior court violated his statutory right to peremptorily disqualify one judge when it denied his motion to set aside the assignment of Judge Gleason to the guardianship case. To support this claim, Terry cites our decision in *Staso v. State, Department of Transportation*[15] and characterizes that case as creating a bright-line rule that litigants are entitled to peremptorily disqualify one judge in any case that involves "a new case number, new filing fees, and new process." Terry notes that in the case at hand, although OCS could have simply requested the superior court overseeing the CINA case to appoint a guardian as part of the ongoing CINA proceedings,[16] it instead chose to bring its request as a separate guardianship case under AS 13.26.030–.085. Because the guardianship case was brought as a separate case—with a new case number, new filing fees, and new process—Terry asserts that he should have been entitled to one peremptory challenge.

OCS disagrees and argues that *Staso* only created a bright-line rule with regard to refiled civil cases and is therefore inapplicable to the case at hand. In support of this argument, OCS notes that *Staso* discussed, but did not disavow, pre-*Staso* cases in which we held that "a party is not entitled to a

10. AS 22.20.022(a) states, in relevant part:
    If a party or a party's attorney in a district court action or a superior court action, civil or criminal, files an affidavit alleging under oath the belief that a fair and impartial trial cannot be obtained, the presiding district court or superior court judge, respectively, shall at once, and without requiring proof, assign the action to another judge of the appropriate court in that district, or if there is none, the chief justice of the supreme court shall assign a judge for the hearing or trial of the action.

11. *In re G.K.*, 497 P.2d 914, 915 (Alaska 1972) (quoting *Channel Flying, Inc. v. Bernhardt*, 451 P.2d 570, 576 (Alaska 1969)).

12. *Tunley v. Municipality of Anchorage Sch. Dist.*, 631 P.2d 67, 71 (Alaska 1981). In criminal cases, the scope and procedures associated with the right are controlled by Civil Rule 42(c)'s criminal law counterpart, Alaska Rule of Criminal Procedure 25(d). *Id.*

13. Civil Rule 42(c) clarifies the procedure for disqualifying a judge in the following manner:

    A party wishing to exercise the right to change of judge shall file a pleading entitled "Notice of Change of Judge." The notice may be signed by an attorney, it shall state the name of the judge to be changed, and it shall neither specify grounds nor be accompanied by an affidavit.

14. Alaska R. Civ. P. 42(c)(4)(i).

15. 895 P.2d 988 (Alaska 1995).

16. AS 47.10.110 provides that if, during the course of a CINA case, "it appears to the court that the welfare of a minor will be promoted by the appointment of a guardian or custodian of the minor's person, the court may make the appointment."

second peremptory disqualification of a judge, or to relief from the waiver or timeliness requirements of Rule 42, where the proceeding in which the disqualification sought is 'ancillary to and a continuation of the underlying ... action.'"[17] Looking to these pre-*Staso* cases, OCS reasons that the guardianship case was "functionally another phase of the CINA proceeding, rather than a new proceeding";[18] that Judge Gleason had presided and continued to preside over the CINA proceeding; and that Terry therefore waived his right to peremptorily disqualify Judge Gleason by participating in the CINA case.

■ Ultimately, we need not decide whether *Staso's* bright-line rule applies to all separately filed cases because sound policy requires that the guardianship and CINA cases be considered and treated as if they were a single, unified case. Although the relevant statutes could be read, as they apparently were here, to permit OCS to split the issue of guardianship off from an ongoing CINA proceeding, that reading raises the problematic specter of forum shopping. As OCS notes, in cases such as this, the issue of guardianship is intimately related to and properly understood as a phase of the ongoing CINA proceeding. This being true, reading the relevant statutes to afford OCS the option of raising the issue of guardianship in a separate and distinct case would effectively afford OCS the option of trying a phase of an ongoing CINA proceeding before a new judge. This sort of forum shopping is generally improper, and we therefore conclude that when there exists an ongoing CINA proceeding, any attempts to appoint a guardian—whether filed pursuant to AS 47.10.110 or AS 13.26.030–.085—must be considered and treated, in all respects, as part of the original CINA case.[19]

Given this conclusion, the fact that OCS raised the issue of guardianship under AS 13.26.030–.085 did not give rise to a separate and distinct guardianship case and therefore did not reinvigorate Terry's statutory right to peremptorily disqualify Judge Gleason. And because Terry had already knowingly participated before Judge Gleason in multiple phases of the CINA proceeding that "concern[ed] the merits of the action," Terry waived his right to disqualify Judge Gleason with regard to the guardianship phase of the case.[20] For these reasons, we affirm the decision of the superior court.

**B. The Superior Court Did Not Err in Finding by Clear and Convincing Evidence that Terry's Continued Custody of the Children Would Result in Serious Emotional or Physical Damage to the Children.**

■ As already noted, all three of Terry's children are Indian children within the meaning of the Indian Child Welfare Act. Under this act, the appointment of a guardian constitutes a "foster care placement"[21] and is therefore subject to the following restriction:

No foster care placement may be ordered in such proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.[22]

---

17. 895 P.2d at 991 (alteration in original) (quoting *Webber v. Webber,* 706 P.2d 329, 330 (Alaska App.1985)).

18. OCS also describes the guardianship case as the "disposition phase" of the CINA proceeding.

19. We briefly note that we need not reverse here based on concerns of forum shopping because no forum shopping actually occurred; the guardianship and CINA cases were consolidated and properly heard by the same judge.

20. *See* Alaska R. Civ. P. 42(c)(4)(i).

21. 25 U.S.C. § 1903(1)(i) defines "foster care placement" as the following:

[A]ny action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated....

22. 25 U.S.C. § 1912(e).

Stated more simply, under the Indian Child Welfare Act, in order for the superior court to appoint a guardian for Terry's children, the court was required to find by clear and convincing evidence that Terry's continued custody of his children was likely to result in serious emotional or physical damage to them. Although the superior court made this finding, Terry argues that the finding was not supported by the record.

Terry argues that "[t]he only way the trial court could have possibly made such a finding ... would [have] be[en] to find that the father had molested the oldest child, Jodi." He then goes on to insist that the superior court's finding by clear and convincing evidence that Terry had in fact "molested his daughter was not adequately supported by evidence, and should be overturned." According to Terry, the only evidence that he sexually abused Jodi was Jodi's own testimony, and this testimony, he argues, was suspect, riddled with inconsistencies, not supported by medical evidence, and sufficiently negated by his own testimony.

First, Terry complains that the only evidence of sexual abuse was Jodi's own testimony. In his words, "[t]here were apparently no witnesses to such an incident, so the only evidence would have been Jodi's testimony." However, the lack of any witnesses is not altogether surprising given the nature of the allegations—an abusive parent can easily take measures to avoid third-party witnesses. For instance, in this case, Jodi testified that the first time her father sexually abused her, he did so on a night when both of her two sisters were staying at their grandmother's house.

Second, Terry complains that Jodi's testimony was highly suspect. He notes that "[t]he day the daughter first accused her

father, the parents had just been in court fighting over custody, and he had been awarded fifty-one percent custody"; that "Jodi was well aware that when she told OCS things, her mother was likely to find out"; and that "Jodi is a girl who has had extraordinary psychological trauma." [23] However, even if true, none of these facts in and of themselves cast doubt upon Jodi's testimony. Moreover, all of this information was before the superior court, and that court found Jodi's testimony to be "persuasive." "Particularly compelling to [the superior] court was her statement at the guardianship proceeding that she had come back to court to testify so as to insure that her sisters were not exposed to the same risk." The credibility of Jodi's testimony was a question for the superior court, and the superior court answered that question decisively. [24]

Third, Terry argues that Jodi's testimony was inconsistent. For example, he asserts that she changed her testimony with regard to the age at which she was subjected to sexual abuse; whether or not she experienced bleeding after the sexual abuse; whether the sexual abuse occurred in Mountain View or Wasilla; and how she was held down during the sexual abuse. However, the bulk of these inconsistencies are minor in nature and wholly understandable given Jodi's minority at the time of the sexual abuse. Moreover, the issue of inconsistent testimony is largely an issue of the credibility of that testimony and this is, as already noted, an issue for the superior court.

Fourth, Terry notes that there is no medical evidence of any sexual abuse and points to information from a physical examination of Jodi that was consistent with her having never engaged in sexual intercourse. [25] How-

23. As Terry notes:
She was molested by an uncle. Her mother at one point had a sex offender for a boyfriend. A close friend of hers was raped by her own father. Her mother died.... And to compound everything, on the night after her mother died she was forcibly raped by another teenager. As a result of all this she has been in [the Alaska Psychiatric Institute] and in another psychiatric facility.

24. *See Silvan v. Alcina,* 105 P.3d 117, 122 (Alaska 2005) (noting that "[i]t is the job of the trial

court, not the appellate court, to judge the credibility of the witnesses and to weigh conflicting evidence") (quoting *Native Alaskan Reclamation & Pest Control, Inc. v. United Bank Alaska,* 685 P.2d 1211, 1215 (Alaska 1984)).

25. The evaluation report of her physical examination stated that her "[h]ymen is estrogenized, redundant and annular in shape, with smooth edges. No evidence of transection."

ever, the medical report specifically stated that "a normal [genital] exam does not exclude the possibility of sexual and/or physical abuse and/or neglect."

Finally, Terry complains that his own testimony and repeated denials of sexual abuse were sufficient to negate Jodi's testimony. However, the superior court expressly considered Terry's testimony and found that it tended to undermine his account. According to the superior court, Terry's testimony reflected a "disturbing pattern" of Terry's "inability to see his past conduct in an accurate light." In particular, the court noted that Terry "does not accept personal responsibility" with respect to the domestic violence he perpetrated against the mother of his children or the excessive physical punishment he leveled against his children. As a result, the superior court concluded that Terry's "testimony that he did not sexually abuse [Jodi] is likely to have been distorted." This line of analysis was supported by the record.[26] And, once again, the credibility of Terry's testimony was a question properly for the superior court.

Overall, there is ample evidence in the record to support the superior court's finding by clear and convincing evidence that Terry had sexually abused his daughter. Jodi recounted the allegations of sexual abuse multiple times, including when she was deposed and when she testified at trial, and the core of these allegations—that her father had sexually abused her on two separate occasions—remained consistent. Also, Jodi's therapist testified that Jodi had discussed the sexual abuse during her counseling sessions and had never recanted her allegations or expressed any confusion over the identity of the perpetrator. Given this evidence, the superior court did not err.

Moreover, Terry is simply incorrect when he asserts that Jodi's allegations of sexual abuse were the only evidence upon which the superior court could have based its conclusion that Terry's continued custody of his children was likely to result in serious emo-

tional or physical damage to them. Indeed, the superior court explicitly relied upon a number of different pieces of evidence, including evidence of Terry's physical abuse of the children's mother, as well as testimony by the children's therapist, who stated that "the children were only recently beginning to disclose in therapy the extent of the physical abuse that their father had inflicted upon them."

For all of these reasons, we conclude that the superior court did not err in finding that Terry's continued custody of his children would result in serious emotional or physical damage to them.

## C. The Superior Court Did Not Err by Requiring Terry To Participate in Sex Offender Treatment Before Being Allowed Visitation with His Children.

In its order regarding visitation, the superior court ruled that Terry would not be allowed any form of visitation with his children until he demonstrates that he "is successfully participating in sex offender treatment." As Terry points out, sex offender treatment generally requires the offender to admit to having committed sexual abuse. As such, the superior court's order effectively means, in Terry's words, "that the father cannot have any contact with his younger children, at least until they turn eighteen, unless he says that he molested his oldest daughter."

Terry argues that the superior court's requirement that he successfully participate in sex offender treatment is improper. He analogizes this requirement to a requirement that a person convicted of a crime admit guilt at sentencing and points to "Alaska's consistent view ... that the trial court should place very little weight on the remorse issue in sentencing, if the defendant has not admitted guilt."[27] According to him, "[t]he courts ought not to make things unduly difficult for

---

**26.** For instance, when asked at trial if he was the victim in the domestic abuse that occurred, Terry responded, "Yes, I am."

**27.** Terry cites specifically to *Willard v. State,* 662 P.2d 971, 979 (Alaska App.1983).

Terry S. just because he refuses to admit to something which he insists he did not do."

However, as OCS points out, our *Nelson* cases are directly on point and preclude Terry's argument.[28] In *Nelson I*, a father appealed the superior court's order conditioning visitation on the father's successful participation in a sex offender treatment program.[29] The father had begun the sex offender program, but refused to admit in therapy that he had sexually abused his daughter, and the therapist cancelled the treatment.[30] Although we recognized that the superior court's order would place an innocent father in a "difficult position"—requiring him to "admit[ ] to acts he did not commit . . . [or] be denied visitation with his daughter"—we nonetheless concluded that the order's "severity [was] justified by the overriding need to protect [the child] from further harm."[31]

Terry attempts to distinguish this case from the *Nelson* cases. According to him, "[t]he most important difference is that Nelson had agreed to a stipulation that he had sexually abused his daughter." This, however, is not a meaningful distinction. As OCS notes in its briefing, "the key fact in the *Nelson* cases (as here) was the finding by clear and convincing evidence that the father had sexually abused his child."[32] Indeed, in *Nelson III* we described *Nelson I* as holding that "the trial court did not clearly err in concluding that [the father] sexually abused [his child] and therefore did not abuse its discretion in conditioning supervised visitation on [the father's] participation in sex-offender treatment."[33]

Here, the superior court found by clear and convincing evidence that Terry had sexually abused his eldest daughter. As such, just as in *Nelson*, the severity of the court's

order was justified by the overriding interest in protecting the children.

**D. The Superior Court's Order Conditioning Visitation on Terry's Participation in Sex Offender Treatment Did Not Amount to a Constructive Termination of Terry's Parental Rights and Therefore Did Not Require Evidence Beyond a Reasonable Doubt.**

Terry argues that because he will not admit to sexually abusing his daughter, the superior court's order conditioning visitation with his children on his participation in sex offender treatment effectively terminated his parental rights. As such, he contends that the superior court's order must be reversed because it did not meet the legal standard for terminating parental rights under the Indian Child Welfare Act. As he notes, under that act, parental rights may not be terminated without "a determination, supported by evidence beyond a reasonable doubt, . . . that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[34]

Again, however, the *Nelson* cases foreclose Terry's argument. In *Nelson III*, although we "decline[d] to decide whether a court could constructively terminate parental rights in the manner asserted by [the father]," we nonetheless concluded that "the trial court's restriction on visitation [was] not, in effect, a termination of [the father's] parental rights."[35] Because the superior court's order in the case at hand was functionally equivalent to the order in *Nelson*, the same conclusion is applicable here: the superior court's order did not effectively terminate Terry's parental rights.

28. Although there are three *Nelson* cases, only two are relevant here: *Nelson v. Jones*, 781 P.2d 964 (Alaska 1989) (*Nelson I* ) and *Nelson v. Jones*, 944 P.2d 476 (Alaska 1997) (*Nelson III* ).

29. 781 P.2d at 969.

30. *Id.* at 967.

31. *Id.* at 969.

32. 944 P.2d at 478.

33. *Id.*

34. 25 U.S.C. § 1912(f).

35. 944 P.2d at 480.

## V. CONCLUSION

For the reasons detailed above, we AFFIRM the superior court's orders.

MATTHEWS, Justice, not participating.