NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| KENDALL H., | ) | |
| | ) | Supreme Court No. S-19489 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-23-00186 CN |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT | ) | AND JUDGMENT* |
| OF FAMILY & COMMUNITY | ) | |
| SERVICES, OFFICE OF CHILDREN'S | ) | No. 2136 – March 11, 2026 |
| SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Ian Wheeles, Judge.

Appearances: Megan M. Rowe, Alaska Legal Drafting, Anchorage, for Appellant. Jennifer Teitell, Assistant Attorney General, Anchorage, and Stephen J. Cox, Attorney General, Juneau, for Appellee. Paul F. McDermott, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Carney, Chief Justice, and Borghesan, Henderson, Pate, and Oravec, Justices.

---

\* Entered under Alaska Appellate Rule 214.

# I.   INTRODUCTION

A mother appeals the termination of her parental rights, challenging the superior court's findings and also suggesting that the court violated her right to due process.  Because we observe no error in the superior court's rulings, we affirm.

# II.   FACTS AND PROCEEDINGS

Kendall H. and Aidan D. are the parents of Roger, born in March 2022.[1] Roger is an Indian child within the meaning of the Indian Child Welfare Act (ICWA) because he is eligible to be enrolled in the Tribe and is the biological child of a member of the Tribe.[2]

The Office of Children's Services (OCS) had multiple contacts with Kendall and Aidan during 2022 and 2023.  OCS substantiated a report of substance abuse during Kendall's pregnancy with Roger in February 2022, and Roger experienced withdrawal symptoms following his birth due to in utero substance exposure.  Aidan also reported daily use of controlled substances during this time.  In response to these circumstances, OCS created an in-home safety plan for both parents.

OCS received reports in May 2023 that Kendall was leaving Roger in the care of relatives for long periods of time without providing a plan, information about her whereabouts, or resources to care for him.  At that time, Roger was living with his paternal grandmother, Sara D.  OCS arrived at Sara's home and found Aidan and Roger there.  Sara told OCS she had been Roger's primary caregiver for the previous 18

---

[1]    We use pseudonyms for all family members to protect their privacy. To protect the family members' privacy, we also avoid identifying Roger's tribe and reference it as "the Tribe."  The Office of Children's Services began collaborating with the Tribe to enroll Roger during the summer of 2023.

[2]    *See* 25 U.S.C. § 1903(4) (defining "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe").

months and had concerns about Aidan's drug use and Kendall's lack of contact with Roger.

During this contact with OCS, Aidan admitted he was still using controlled substances and expressed willingness to complete a substance use assessment and engage in treatment. He told OCS he did not know where Kendall was and did not have contact information for her. The following day, when OCS workers returned to Sara's home, they found that Aidan had left without providing any contact information. For the next three weeks, OCS attempted to contact Kendall by phone, text, email, and in person, with no success. OCS also spoke with Sara, who said she had no contact with either parent.

OCS took emergency custody of Roger in June 2023 and formally placed him with Sara. Most of the agency's subsequent efforts were directed at making contact with the parents. OCS made multiple attempts to give Kendall notice of the court proceedings by mail, email, and phone and through her family members. These efforts were initially unsuccessful, but Sara was eventually able to hand-deliver OCS's notice to both parents.

OCS created a case plan for Kendall in July, but it was done without her participation due to her lack of contact. The goals of the case plan were for Kendall to address her substance use and mental health issues, maintain a healthy relationship with Roger, and provide an environment that supported Roger's needs. OCS mailed the plan to Kendall's last known address.

At a hearing in August 2023, OCS reported it had had no contact with Kendall since the inception of the case. However, Sara reported an "unexpected contact" with Kendall: She had taken Roger to a playground and Kendall saw them and told Sara she would come by Sara's house to use the phone. Sara told Kendall it was "so important" that she get in contact with OCS. But Kendall failed to follow through and did not come to Sara's house.

OCS had some success engaging Kendall and Aidan in September. Both parents confirmed with the agency that they were homeless and living together. They also completed an application for parenting classes. Further, both parents requested attorneys, the court appointed counsel, and OCS set up supervised visitation. When Kendall arrived at the OCS office for visitation at the end of that month, she was arrested on an open warrant, but released from custody shortly afterward. OCS arranged two other supervised visits in early October, but both visits were cancelled after Kendall failed to confirm she would attend.

Between October 2023 and January 2024, Kendall's attorney reported that he had contact with her only once. In that instance, the attorney's paralegal had traveled to Kendall's last known address and handed her OCS's petition to adjudicate Roger as a child in need of aid (CINA). Kendall told the paralegal that she wanted time to think about how to proceed, but the attorney had been unable to contact her since then.

Kendall was not present for subsequent hearings in March and May of 2024. Kendall's attorney stated he had "no comment" about whether he had been in contact with her. In May the OCS caseworker stated that he was "scouring" government websites for information about court hearings and incarcerated individuals because he hoped to contact Kendall if she was arrested on her outstanding warrant. OCS continued trying to contact Kendall and noted that it had continued to make referrals to the OCS family contact team for visitation, arrange for cab rides to the OCS building for in-person case planning, and provide bus passes.

Kendall and Aidan unexpectedly arrived at Sara's house in August and stayed with her for four days. Sara did not notify OCS about this contact until after the fact. But she confirmed that neither parent had a phone and indicated that they could be living in the vicinity of a particular street in Anchorage. Between August and December 2024, Kendall did not attend any hearings or respond to any of OCS's attempted contacts. Kendall left a voicemail for a caseworker in January 2025; the caseworker returned her call and left a voicemail, but Kendall did not follow up.

Kendall attended the first day of the termination trial in February 2025 and her attorney represented that she had achieved sobriety. But when the caseworker sought collateral proof of her sobriety, he was unable find any reliable corroboration. Kendall did not attend the second and third days of trial, despite attempts to contact her.

The superior court heard testimony at trial from three caseworkers, a cultural expert, and an expert in child welfare. The OCS workers testified regarding the circumstances leading to Roger's removal, OCS's reunification and contact efforts, and the parents' lack of engagement with their case plans. Sara testified that Roger was doing well in her care and was connected with his Tribe and community.

The bulk of the trial testimony came from the experts. The cultural expert testified that removing a child from a parent is "one of the last things" the Tribe wants to do. But as in this case, where a parent has not sought treatment for substance abuse, the risk of harm to the child from that substance abuse would present concerns severe enough to warrant removal. The child welfare expert described the specific harms that can result from parental substance use and abandonment, opining that the parents' ongoing substance use led to risks of harm for Roger because his parents continuously left him with a caregiver who could not make legal or medical decisions for him.

After trial, the superior court found that Roger was a child in need of aid based on abandonment[3] and substance abuse.[4] The court found clear and convincing evidence that both parents failed to remedy the conduct that placed Roger in need of aid. It determined that OCS made "reasonable and active efforts" to reunify the family, but that those efforts were unsuccessful. The court also determined there was proof beyond a reasonable doubt that the parents' custody would be likely to result in serious emotional or physical damage to Roger. Finally, the court found that it was in Roger's

---

[3]     AS 47.10.011(1).

[4]     AS 47.10.011(10).

best interests to terminate both parents' rights. Accordingly, the superior court entered an order terminating the parental rights of both Kendall and Aidan.

Kendall appeals.[5]

## III. STANDARD OF REVIEW

"Whether a child is in need of aid and whether the parent failed to remedy the 'conduct or the conditions that placed the child at substantial risk' of harm are factual findings."[6] But "[t]he sufficiency of the state's 'active efforts' under ICWA presents a mixed question of law and fact,"[7] as does whether "substantial evidence supports the [superior] court's conclusion [under ICWA] that an Indian child is likely to be seriously harmed if returned to his parent."[8]

"[W]e review a trial court's factual findings for clear error and questions of law de novo."[9] "Factual findings are clearly erroneous if review of the entire record leaves us with a 'definite and firm conviction that a mistake has been made.' "[10]

---

[5]     Aidan's parental rights are not at issue in this appeal.

[6]     *Sherman B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 290 P.3d 421, 428 (Alaska 2012) (quoting *Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 270 (Alaska 2011)).

[7]     *Doe v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 272 P.3d 1014, 1019-20 (Alaska 2012).

[8]     *Terry S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 168 P.3d 489, 493 (Alaska 2007) (alterations in original) (quoting *E.A. v. State, Div. of Fam. & Youth Servs.*, 46 P.3d 986, 989 (Alaska 2002)).

[9]     *Joy B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 382 P.3d 1154, 1162 (Alaska 2016) (quoting *Chloe W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 336 P.3d 1258, 1264 (Alaska 2014)) (internal quotation marks omitted).

[10]     *Chloe W.*, 336 P.3d at 1264 (quoting *Sherman B.*, 290 P.3d at 427-28).

"Whether due process rights are violated in a CINA case is a question of law that this court reviews de novo, adopting 'the rule of law that is most persuasive in light of precedent, reason and policy.' "[11]

## IV. DISCUSSION

On appeal Kendall argues that the superior court erred by concluding that Roger was in need of aid; that she failed to remedy the conditions that placed Roger in need of aid; that OCS made active efforts to reunify the family as required by ICWA; and that placing Roger in her custody would result in serious harm to him. Kendall also asserts the court violated her right to due process through procedural irregularities and improper attribution of Aidan's conduct to her. For the reasons explained below, we hold that Kendall's arguments are not persuasive and affirm the termination of her parental rights.

### A. The Superior Court Did Not Clearly Err By Finding That Roger Was A Child In Need Of Aid.

Before terminating a parent's rights, a superior court must find by clear and convincing evidence that a child is in need of aid under AS 47.10.011.[12] Here, the superior court found Roger was in need of aid under AS 47.10.011(1) (abandonment) and AS 47.10.011(10) (substantial risk of harm due to parental substance abuse). Kendall argues the court clearly erred by making these findings. We disagree and conclude the court did not clearly err by finding that Roger was in need of aid based on Kendall's substance abuse. Because we affirm the superior court's finding that Roger

---

[11] *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 264 P.3d 842, 846 (Alaska 2011) (quoting *Jeff A.C., Jr. v. State*, 117 P.3d 697, 702 (Alaska 2005)).

[12] AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A); *see also Barbara P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 234 P.3d 1245, 1254 (Alaska 2010).

was in need of aid based on Kendall's substance abuse, we need not reach the superior court's additional conclusion that Roger was in need of aid because of abandonment.[13]

With regard to the superior court's substance abuse finding,[14] Kendall asserts that the superior court placed too much focus on the fact that she used controlled substances during her pregnancy with Roger. She also argues that the court improperly discounted her attempts to attend substance abuse assessments, participate in visitation, and maintain contact with Roger through relatives. And Kendall argues that by focusing on these circumstances, the court simply presumed that she had relapsed without concrete proof.

Kendall's arguments are unpersuasive. Efforts to achieve sobriety and reunification are not relevant to a court's finding that a child is in need of aid. A finding under AS 47.10.011(10) looks to past conduct and conditions, requiring only that a parent's ability to parent "has been" impaired by drug use and "has resulted" in a substantial risk of harm to the child.[15] The superior court therefore properly focused on the fact that Roger had been harmed by Kendall's substance abuse during pregnancy.

---

[13] *See Brad S. v. State, Dep't of Fam. & Cmty. Servs., Off. of Child.'s Servs.*, 563 P.3d 610, 621 (Alaska 2025) ("Only one ground under AS 47.10.011 is necessary to sustain an order adjudicating a child in need of aid.").

[14] AS 47.10.011(10) (designating child in need of aid if "parent, guardian, or custodian's ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant, and the addictive or habitual use of the intoxicant has resulted in a substantial risk of harm to the child").

[15] *Id.*; *see also Barbara P.*, 234 P.3d at 1259 (holding court may consider and make findings about harm based on risks parent's conduct created "at some time prior to the adjudication"). Instead, subsequent attempts at and proof of sobriety are relevant to the court's findings as to whether a parent has remedied their conduct. *Id.* To the extent that Kendall also argues that "OCS must show a substantial risk of serious harm if returned to the parent" to make a child in need of aid finding, we reject her argument with respect to the court's findings in this case; as discussed above, AS 47.10.011(10) does not direct courts to consider future harms in relation to substance abuse.

OCS presented evidence that Kendall tested positive for amphetamines, THC, opiates, and heroin a week before Roger's birth and that Roger experienced withdrawal symptoms following his birth due to in utero substance exposure. Further, there was evidence that Kendall's substance abuse led her to abandon Roger, which resulted in additional risks because he had no caretaker with the authority to make medical decisions for him.

We observe no clear error in the superior court's finding that Roger was a child in need of aid because of Kendall's substance abuse.

**B.** **The Superior Court Did Not Clearly Err By Finding That Kendall Failed To Remedy The Conditions That Placed Roger In Need Of Aid.**

Before terminating parental rights, a superior court must also find by clear and convincing evidence that a parent has either failed to remedy the conduct or conditions placing their child in need of aid[16] or failed to do so within a reasonable time.[17] When considering whether a parent has failed to remedy conduct or conditions that placed their child in need of aid, the court may consider any fact related to the child's best interests.[18]

The superior court found that Kendall failed to remedy her conduct because there was no evidence that she participated in substance abuse treatment, achieved sobriety, or otherwise engaged with her case plan activities. In challenging

---

[16] AS 47.10.088(a)(2)(A) (providing court may find child in need of aid if parent "has not remedied the conduct or conditions . . . that place the child at substantial risk of harm").

[17] AS 47.10.088(a)(2)(B) (providing court may find child in need of aid if parent "has failed, within a reasonable time, to remedy the conduct or conditions . . . that place the child in substantial risk . . .").

[18] AS 47.10.088(b) (providing non-exclusive list of factors for consideration).

this finding, Kendall repeats her assertions that the court erred by placing too much emphasis on her prior behavior and by discounting her more recent progress.[19]

Kendall's arguments on this point are unpersuasive. The court is permitted to rely on prior conduct to consider the "harm caused" to Roger[20] and Kendall's "history of conduct"[21] under AS 47.10.088(b). And there was substantial evidence that Kendall's substance abuse during pregnancy actually resulted in harm and risks of harm to Roger.

The superior court also properly considered Kendall's efforts to remedy her substance abuse issues,[22] concluding that Kendall had demonstrated a "lack of effort" with regard to her case plan despite having an extensive period of time to engage. Kendall's case plan was designed to address her substance abuse by requiring her to complete assessments, follow treatment recommendations, and participate in random urinalysis (UAs). Apart from three negative UAs at the beginning of the case and some efforts to attend visitation, there was no evidence that Kendall actually completed any of the requirements in her case plan.

Kendall asserts that she made attempts to attend substance abuse assessments, but the record contains scant support for this claim. OCS presented evidence that after Kendall provided three negative UAs in 2022, she no-showed for at

---

[19]    Kendall's briefing somewhat confusingly combines her objections to the court's child in need of aid findings and failure to remedy findings. Because both findings are discussed together in Kendall's briefing, we understand that she is asserting the same arguments — that the court erred by emphasizing her prior behavior and discounting her recent progress — with respect to both findings.

[20]    AS 47.10.088(b)(3).

[21]    AS 47.10.088(b)(5); *see also Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs.*, 74 P.3d 896, 903 (Alaska 2003) ("The superior court is entitled to rely on a parent's documented history of conduct as a predictor of future behavior.").

[22]    AS 47.10.088(b)(2).

least ten UAs before the referral was cancelled.  And although Kendall informed OCS in late 2024 that she was sober, the only corroboration she offered to OCS was to identify the names of three individuals that she said would vouch for her sobriety.  OCS was able to reach only one of these individuals — a relative who told OCS that Kendall was sober.  But the relative did not live in the same community as Kendall and had no firsthand information.  Thus, contrary to Kendall's argument, the court did not simply make an "assumption" that she was not sober.  Instead, the court concluded that Kendall's history of substance abuse, the history of harm to Roger from that substance abuse, the high likelihood that harm would continue absent treatment, and her near-complete lack of engagement with assessments and treatment all indicated that she had not successfully achieved sobriety.

Given the clear and convincing evidence supporting the superior court's findings, as well as the dearth of information corroborating Kendall's sobriety, we hold that the superior court did not clearly err when it found she failed to remedy her conduct related to substance abuse.

### C. Although OCS's Efforts Were Not Perfect, The Superior Court Did Not Err By Concluding That OCS Made Active Efforts.

In cases involving an Indian child, before a court may terminate parental rights, it must conclude there is clear and convincing evidence that OCS has made "active efforts . . . designed to prevent the breakup of the Indian family."[23]  Kendall challenges the superior court's ruling that OCS made "reasonable and active efforts" by way of the agency's many attempts to contact her over the life of the case.  Although, ideally, OCS's efforts would have included additional attempts to contact Kendall, we ultimately hold that the court did not err by determining OCS made active efforts.

---

[23]     25 U.S.C. § 1912(d); *see Demetria H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 433 P.3d 1064, 1070-71 (Alaska 2018).

The superior court's reference to "reasonable" efforts is misplaced; Roger is an Indian child, and therefore OCS's efforts must be assessed under the more demanding ICWA standard of "active efforts."[24] Nonetheless, because the question of whether agency efforts are "active" is ultimately a legal one, we are able to review the superior court's ruling.

Specifically, the superior court found that due to "no fault of [OCS], [OCS] could not establish meaningful communication" with Kendall because of her "unwillingness to engage." Kendall asserts that the court erred by finding that OCS made active efforts. She argues the agency merely handed her referrals and there was little evidence that OCS tailored services to her cultural background and community or assisted her in obtaining appointments and overcoming barriers such as homelessness and transportation.

Kendall correctly points out that ICWA requires the agency to do more than simply provide a case plan and referrals. Instead, the requirement of active efforts contemplates that OCS will provide affirmative, culturally appropriate, and sustained assistance to ensure that parents can benefit from services offered.[25] These efforts must

---

[24] *Clark J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 483 P.3d 896, 901 n.13 (Alaska 2021) ("The superior court's termination order referred to both 'reasonable efforts' and 'active efforts.' All cases involving Indian children are subject to ICWA's more stringent 'active efforts' requirement."); *Winston J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 134 P.3d 343, 347 n.18 (Alaska 2006) ("[T]he 'active efforts' requirement of ICWA is more demanding than the 'reasonable efforts' requirement of AS 47.10.086."); *Casey K. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 311 P.3d 637, 646-47 (Alaska 2013) (providing that active efforts standard in ICWA cases imposes "higher burden" on OCS than reasonable efforts standard); *Betsy F. v. State, Dep't of Fam. & Cmty. Servs., Off. of Child.'s Servs.*, 576 P.3d 647, 653 n.26 (Alaska 2025) ("[I]t was peculiar for the court to refer to 'reasonable efforts' in a case controlled by ICWA.").

[25] *Mona J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 511 P.3d 553, 561 (Alaska 2022) ("[A]ctive efforts should be provided in a manner

also be conducted in a "thorough[] and timely" manner[26] and are evaluated on a "case-by-case basis" considering OCS's "involvement in its entirety."[27]

Here, the majority of OCS's efforts focused on securing contact with Kendall. Between June 2023 and February 2025, OCS made several calls to Kendall's last known phone number, attempted to serve her at her last known address, sent her emails, and searched government websites to determine if she had other court hearings or was incarcerated. In its attempts to contact Kendall, the agency also collaborated with the Tribe, Sara, and Kendall's attorney.[28] Apart from one apparent OCS office visit, one phone contact, and one attempted family visitation prior to trial, these efforts at contact were unsuccessful.

We have stated that "OCS always has an obligation to make active efforts, regardless of whether a parent cooperates."[29] But we have also recognized that "a parent's noncooperation with OCS will necessarily affect the kinds of efforts OCS is able to make toward reunification."[30] In this case, it was appropriate for the bulk of

---

consistent with the prevailing social and cultural conditions and way of life of the Indian child's Tribe . . . ." (quoting 25 C.F.R. § 23.2 (2021))).

[26] 25 C.F.R. § 23.2 (2025).

[27] *Sam M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 442 P.3d 731, 736 (Alaska 2019) (quoting *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 527 (Alaska 2013)) (internal quotation marks omitted).

[28] OCS represents in briefing that the agency made additional "diligent inquiries" to contact Kendall. However, we will not rely on such representations because the agency has not explained with any particularity what those inquiries involved. *But cf., e.g.*, *M.W. v. State, Dep't of Health & Soc. Servs.*, 20 P.3d 1141, 1146 (Alaska 2001) (relying on affidavit of diligent inquiry specifying efforts included "checking phone books, utility applications, permanent fund dividend applications, and criminal records").

[29] *Mona J.*, 511 P.3d at 564.

[30] *Id.*

OCS's efforts to be directed toward gaining and maintaining contact with Kendall, especially because Kendall's lack of contact and engagement ultimately limited the other efforts OCS could make.[31] And during the short periods when Kendall was in contact with OCS, the agency was active in its attempts to provide services. For example, when Kendall contacted OCS in September 2023, OCS made calls to treatment centers, assisted her in signing up for parenting classes, arranged for her to have supervised visitation, and helped her request the appointment of an attorney. Additionally, although Kendall remained largely out of contact, OCS created case plans for her and arranged visitation.

Further, OCS did not disregard the barriers Kendall faced in accessing services.[32] Instead, the agency offered bus passes and cab rides so that Kendall could reach the OCS office even when she was not in contact. OCS also provided Kendall with opportunities for family visitation at the OCS office, which were cancelled when she did not confirm her attendance. We understand Kendall's hesitation to appear at visitation given her arrest on an open warrant during her first attempt at visitation. But this circumstance does not detract from the agency's efforts because there is no suggestion that OCS contacted police or knew that Kendall was going to be arrested at that time.

Kendall suggests that once OCS determined that her phone number and last known addresses were no longer current, the agency should have tried to contact her in other ways. There may be circumstances where OCS's active efforts should

**31** *See, e.g.*, *Sylvia L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 343 P.3d 425, 432-33 (Alaska 2015).

**32** *See, e.g.*, *Walker E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 480 P.3d 598, 607-08 (Alaska 2021) (rejecting parent's argument that OCS made insufficient efforts to overcome barriers when OCS offered transportation vouchers and bus passes and communicated with parent through parent's tribe and relatives).

include pursuing certain leads in contacting a parent, particularly where the agency has information that a parent is consistently residing at or frequenting a specific location or area. Here, Sara informed OCS at one point that Kendall might be frequenting the vicinity of a particular street or streets in Anchorage. But that information did not identify the location with any particularity or suggest that Kendall was living there for any sustained period of time. Further, the record suggests that discerning Kendall's whereabouts at any particular time was fairly difficult.

Under the circumstances, the chances of locating Kendall based on the information Sara provided were far from certain. But ideally, as a part of active efforts, OCS would have taken the extra step to look for Kendall in the vicinity of the streets in question. "However, the active efforts requirement does not require perfection."[33] And we look to OCS's "involvement in its entirety" when we review a finding of active efforts.[34] Considering the agency's efforts in their entirety, and given Kendall's highly transient living situation and her demonstrated lack of interest in communicating with OCS, we conclude that the superior court did not err by ruling that OCS made active efforts.

---

[33] *Mona J.*, 511 P.3d at 561 (quoting *Pravat P. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 249 P.3d 264, 272 (Alaska 2011)) (internal quotation marks omitted); *see also Sylvia L.*, 343 P.3d at 432 ("Reunification efforts need not be perfect; they need only be reasonable under the circumstances, depending on the parent's substance abuse history, willingness to participate in treatment, the history of services provided by OCS, and the parent's level of cooperation." (footnotes omitted)).

[34] *Sam M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 442 P.3d 731, 736 (Alaska 2019) (quoting *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 527 (Alaska 2013)) (internal quotation marks omitted).

**D.    The Superior Court Did Not Err By Finding That Placing Roger In Kendall's Custody Would Result In Serious Emotional Or Physical Harm.**

For cases involving an Indian child, ICWA requires OCS to present evidence beyond a reasonable doubt, including qualified expert testimony, that continued parental custody is likely to result in serious emotional or physical harm to the child.[35]  We have previously held that a finding of serious emotional or physical harm requires "both proof that the parent's conduct is likely to harm the child[], and proof that it is unlikely that the parent will change [their] conduct."[36]

Kendall asserts that the superior court erred by finding that her continued custody would result in serious emotional or physical harm to Roger.  She suggests that there was no evidence of "any specific, imminent danger" to Roger from her care and that the court improperly relied on "generalized" testimony from OCS's experts.  We reject Kendall's arguments on these points.

First, Kendall's argument that the court needed evidence demonstrating a "specific, imminent danger" to find that her continued custody was a risk to the child is unsupported by law.  While § 1912(f) of ICWA requires OCS to prove that a parent's custody is likely to result in serious harm "beyond a reasonable doubt," we have never held that this burden of proof creates a substantive requirement for OCS to prove a "specific, imminent danger."  And "[b]ecause § 1912(f) looks to likely future harm to the child,"[37]  it was not error for the court to rely on evidence of prior conduct to make a rational prediction about Kendall's behavior in the future.

---

[35]    25 U.S.C. § 1912(f); *see also* CINA Rule 18(c)(4).

[36]    *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 950 (Alaska 2000), *abrogated on other grounds by State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs. v. Cissy A.*, 513 P.3d 999 (Alaska 2022).

[37]    *Id.* (quoting *In re J.R.B. & T.W.G.*, 715 P.2d 1170, 1172 (Alaska 1986)) (internal quotation marks omitted).

Moreover, while Kendall is correct that OCS must present the testimony of an expert qualified to opine on "the causal connection between the parent's conduct and serious damage to the child," a cultural expert need not "directly opine on causation" if there is another expert qualified to do so.[38] Further, the risk of harm "may be proved through the testimony of one or more expert witnesses, or by aggregating the testimony of lay and expert witnesses."[39] The aggregate testimony and evidence regarding Kendall's substance abuse and failure to engage in rehabilitative services supports the superior court's conclusion that Kendall's custody would result in serious harm to Roger.

The child welfare expert testified specifically that Roger was at a substantial risk of harm without a safety plan because both parents were using substances and facing housing insecurity. The expert detailed the causal connection between parental substance use and the harms already caused to Roger, including the post-birth withdrawal symptoms and the absence of an adult able to consent to Roger's medical care or apply for childcare assistance on his behalf. The expert also reviewed the case files and concluded that there was no evidence either parent had remedied any of the safety concerns that placed Roger in need of aid, meaning there was a continued risk of harm. In addition to the child welfare expert's testimony, the cultural expert reviewed documents from the case and testified that neither parent would have a strong bond with Roger and that neither parent had addressed their substance use concerns. The cultural expert opined that Roger deserved finality, especially because the parents had not placed the child's interests before their own. The aggregate testimony and

---

[38] *Cissy A.*, 513 P.3d at 1011, 1015-16.

[39] *Demetria H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 433 P.3d 1064, 1074 (Alaska 2018) (quoting *Bob S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 400 P.3d 99, 108 (Alaska 2017)) (internal quotation marks omitted).

evidence regarding Kendall's substance abuse and failure to engage in rehabilitative services and visitation with her child clearly supported a conclusion that Roger would be likely to suffer severe harm if returned to her care.

Finally, Kendall repeats her argument that the superior court improperly discounted her recent attempts at establishing stability. Specifically, she states that by the time of trial, she "had expressed interest in sobriety, maintained contact with her child, and was seeking to engage with services." But as discussed above, Kendall presented very little evidence that she was making any meaningful progress toward sobriety. And as established by the testimony of both experts, the expression of interest in sobriety is insufficient to remedy the risks of harm to Roger.

In light of the record, we conclude the court did not err by determining that placing Roger in Kendall's custody would result in serious emotional or physical harm.

### E.     The Superior Court Did Not Violate Kendall's Due Process Rights.

"[D]ue process requires that any action involving deprivation of life, liberty or property by adjudication must be preceded by notice and opportunity for hearing appropriate to the nature of the case."[40] Parents are thus entitled to due process throughout CINA proceedings.[41] But a parent seeking to demonstrate a due process violation must show that the contested court action resulted in "actual prejudice . . . and not merely the theoretical possibility of prejudice."[42] When assessing prejudice, we

---

[40]     *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 264 P.3d 842, 846 (Alaska 2011) (alteration in original) (quoting *In re Estate of Fields*, 219 P.3d 995, 1009 (Alaska 2009)) (internal quotation marks omitted).

[41]     *Tara R. v. State, Dep't of Fam. & Cmty. Servs., Off. of Child.'s Servs.*, 541 P.3d 530, 539-40 (Alaska 2024).

[42]     *Paula E. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 276 P.3d 422, 433 (Alaska 2012) (quoting *D.M. v. State, Div. of Fam. & Youth Servs.*, 995 P.2d 205, 212 (Alaska 2000)) (internal quotation marks omitted).

must consider "the likelihood that proper notice might alter the outcome" of the termination proceeding.[43]

Kendall argues that she was deprived of due process through a combination of procedural irregularities and the superior court's apparent reliance on Aidan's conduct as a justification for termination rather than her own individualized conduct. We disagree.

First, Kendall's argument that she was deprived of due process through procedural irregularities is unpersuasive. Kendall appears to assert that she lacked legally sufficient notice and representation at the June 2023 emergency probable cause hearing and the August 2023 pretrial conference. But she fails to articulate any prejudice stemming from these alleged violations. Inadequate notice or representation for either of these hearings early in the CINA proceedings would not have affected Kendall's ability to later "offer evidence about the nature and consequences of the conduct relevant to termination issues."[44] Further, we have previously held that inadequate notice or representation in early hearings does not prejudice a parent where the parent ultimately had counsel and sufficient notice of termination hearings.[45] And Kendall does not dispute that she had notice and representation at both the adjudication and the termination trial. Given the lack of prejudice resulting from any alleged inadequate notice or representation in the pre-adjudication proceedings, we conclude the superior court did not violate Kendall's due process rights.

Second, the superior court's order on termination did not improperly deprive Kendall of individualized consideration. The court's findings largely discuss Kendall and Aidan separately, even where the court comes to similar conclusions about

---

[43] *D.M.*, 995 P.2d at 212.

[44] *Id.* at 213.

[45] *Id.* at 213-14; *Payton S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 349 P.3d 162, 168-69 (Alaska 2015).

both parents. The court made two joint findings about Kendall and Aidan: (1) Roger was in need of aid based on the parents' substance abuse and (2) there was a continued risk of harm to Roger from both parents.[46] But the court did not attribute Aidan's conduct to Kendall when it made these findings about both parents. The court arrived at a conclusion about Kendall's substance abuse issues based on its discussion of her own history of addiction and her lack of engagement with her case plans. Similarly, based on expert testimony about the specific risks associated with her conduct and lack of progress in treatment, the court concluded Kendall's custody would pose a risk of substantial harm to Roger. Accordingly, we hold that the superior court provided Kendall with adequate individualized consideration and did not violate her process rights.

## V. CONCLUSION

The superior court's order terminating parental rights is AFFIRMED.

---

[46] Kendall does not point to particular statements where she believes the court conflated the parents' circumstances.